This Opinion is Not a
Precedent of the TTAB

Mailed: January 30, 2017

UNITED STATES PATENT AND TRADEMARK OFFICE

————

Trademark Trial and Appeal Board

————

*Luxco, Inc.*

*v.*

*Consejo Regulador del Tequila, A.C.*

————

Opposition No. 91190827

————

Michael R. Annis of Husch Blackwell LLP,
    for Luxco, Inc.

Lawrence E. Abelman and Marie-Anne Mastrovito of Abelman, Frayne & Schwab,
    for Consejo Regulador Del Tequila, A.C.

**NOTICE OF CORRECTION**

————

**By the Board:**

On January 23, 2017, the Board issued a final decision in connection with the above noted opposition. The posted decision had three typographical errors that must be corrected.

There were two typographical errors in footnote 29. The proper footnote reads as follows:

> Section 2(e)(2) of the Trademark Act, 15 U.S.C. § 1052(e)(2), reads in pertinent part that "No trademark by which goods of the applicant may be distinguished from the goods of others shall be refused registration on the principal register on account of its nature unless it . . . (e) Consists of a mark which, . . . (2) when used on or in connection with the goods of the applicant is primarily geographically descriptive of them, *except as indications of regional origin may be registrable under Section 1054 of this title."* (Emphasis added).

The Appendix setting forth the record incorrectly states the mailing date of the decision as November 25, 2016.

A corrected copy of the Board's final decision is attached.

Opposer's time for filing an appeal or commencing a civil action regarding the Board's decision continues to run from the mailing date of the January 23, 2017 decision.  *See* Trademark Rule 2.145(d)(1), 37 C.F.R. §2.145(d)(1).

This Opinion is a
Precedent of the TTAB

Hearing: September 12, 2016          Mailed: January 23, 2017

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

Trademark Trial and Appeal Board

_____

*Luxco, Inc.*

*v.*

*Consejo Regulador del Tequila, A.C.*

_____

Opposition No. 91190827

_____

Michael R. Annis of Husch Blackwell LLP,
     for Luxco, Inc.

Lawrence E. Abelman and Marie-Anne Mastrovito of Abelman, Frayne & Schwab,
     for Consejo Regulador Del Tequila, A.C.

_____

Before Kuhlke, Bergsman and Adlin,
     Administrative Trademark Judges.

Opinion by Bergsman, Administrative Trademark Judge:

Consejo Regulador del Tequila, A.C. ("Applicant") seeks registration on the Principal Register of the certification mark TEQUILA (in typed drawing form) for "distilled spirits, namely, spirits distilled from the blue tequilana weber variety of

agave plant," in Class A.[1] The application includes the certification statement set forth below:

> The certification mark "Tequila", as used by persons authorized by the Consejo Regulador del Tequila, A.C. ("CRT" or "Certifier"), certifies that (1) the goods are manufactured in Mexico from a specific variety of the blue agave plant grown in certain regions of Mexico as defined by Mexican law and standards; (2) the goods are manufactured in Mexico in compliance with Mexican law and standards including fermentation, distillation, aging, the percentage of blue agave sugars and physical-chemical specifications; and (3) the finished product is or contains within it the goods manufactured in accordance with (1) and (2) above.[2]

Luxco, Inc. ("Opposer") opposed the registration of Applicant's certification mark on the grounds that (I) Tequila is a generic term for a type of distilled spirits, (II) Applicant has allowed others to use the term Tequila for purposes other than as a certification mark, (III) Applicant "does not now and cannot control the use of the term 'tequila' in the United States," (IV) Applicant itself produces and markets Tequila, (V) Applicant has failed to police the use of the term Tequila and has allowed others to use Tequila for purposes other than to certify, and (VI) fraud.[3]

In its Brief, Opposer argued the claims that Tequila is generic (Count I), that Applicant has not and cannot exercise legitimate control over the use of the term

---

[1] Application Serial No. 78286762 was filed on August 13, 2003, based upon Applicant's claim of first use anywhere and in commerce since at least as early as January 1, 1995. Prior to November 2, 2003, "standard character" drawings were known as "typed" drawings. A typed mark is the legal equivalent of a standard character mark. TMEP § 807.03(i) (October 2016).

[2] June 26, 2009 Post-Publication Amendment.

[3] 59 TTABVUE. For consistency of presentation in this opinion, and in view of our ultimate finding that the mark is entitled to registration, we use Tequila unless quoting an evidentiary source that refers to "tequila."

Tequila (Count III), and fraud (Count VI). Opposer did not pursue the claims that Applicant allowed others to use Tequila for purposes other than as a certification mark (Counts II and V) and that Applicant itself produces and markets Tequila (Count IV). Accordingly, Counts II, IV, and V are deemed waived. *See Alcatraz Media v. Chesapeake Marine Tours Inc.*, 107 USPQ2d 1750, 1753 n.6 (TTAB 2013), *aff'd mem.*, 565 Fed. Appx. 900 (Fed. Cir. 2014).

Applicant, in its Answer, denies the salient allegations in the Notice of Opposition.

## I.  Evidentiary Issue

The parties have lodged numerous objections. None of the evidence sought to be excluded is outcome determinative. Moreover, the Board is capable of weighing the relevance and strength or weakness of the objected-to testimony and evidence, including any inherent limitations. For the reasons discussed in the attached appendix, we find no basis on which to strike any testimony or other evidence. As necessary and appropriate, we will point out any limitations in the evidence or otherwise note that the evidence cannot be relied upon in the manner sought. We have considered all of the testimony and evidence introduced into the record. In doing so, we have kept in mind the various objections raised by the parties and we have accorded whatever probative value the subject testimony and evidence merit.

## II.  The Record

The record is presented in the attached appendix, which includes our discussion of evidentiary issues raised by the record.

## III. The Parties

### A. Opposer

Since 1958, Opposer has imported and bottled alcoholic beverages, including Tequila and distilled spirit specialties containing Tequila.[4] Opposer does not distill spirits; it purchases distilled spirits from others, including bottled spirits ready for further distribution.[5] In other words, Opposer imports Tequila in bulk (for later bottling) and in bottles.[6]

> Q. Can you describe what types of manufacturing operations that [Opposer] performs on the bulk tequila it purchases?
>
> A. In terms of straight bulk, it is the addition of water, filtration, and put it in a bottle. In terms of products containing tequila, it would be tequila and other ingredients such as other spirit products, other flavorings to make what we refer to as a distilled spirit specialty in many cases and in -- put into a bottle and ready for distribution.[7]

In short, Opposer supplies distilled spirits and sells its finished products to other distributors.[8]

---

[4] Bratcher Dep., pp. 7-9 (147 TTABVUE 8-10).

[5] *Id.*

[6] Bratcher Dep., p. 13 (147 TTABVUE 14).

[7] Bratcher Dep., p. 15 (147 TTABVUE 26); Streepy Dep. p. 11 (148 TTABVUE 12).

[8] Bratcher Dep., pp. 10-11 (147 TTABVUE 11-12); Streepy Dep., p. 11 (148 TTABVUE 12). The regulations for the Alcohol and Tobacco Tax and Trade Bureau ("TTB") of the U.S. Department of Treasury prohibit Opposer from selling directly to retailers. Bratcher Dep. p. 11 (147 TTABVUE 12). The TTB is "the regulating agency in the United States for the distribution of all spirits products, wine and beer," including the approval of labels. Bratcher Dep., p. 21 (147 TTABVUE 22). Thus, the labels on the bottles of Tequila sold by Opposer, as well as its distilled specialty spirits, must be approved by the TTB. *Id.*

Opposer purchases its Tequila from Destiladora Gonzalez & Gonzalez and La Madrilena,[9] both of which are Mexican Tequila suppliers.[10] Applicant certifies that all the Tequila that Opposer imports in bulk and in bottles is authentic Tequila in accordance with Mexican law.[11] Opposer files quarterly reports with Applicant "to show the bulk that was imported in the United States, what brands it was used in."[12] Applicant maintains a registry of authorized bottlers of Tequila in the United States.[13]

### B. Applicant

Applicant "is a [non-profit] civil association and it is [a] private body accredited and approved according to Mexican laws to carry out activities of evaluation of the conformity, mainly about the production of tequila."[14] The National Directorate of Norms has approved Applicant as "a unit of verification, as a test lab and a body of certification, the activity of evaluation and [to] certify the tequila."[15] Applicant "is the only body accredited and approved to evaluate the NOM [Mexican Official Standard]

---

[9] Bratcher Dep., p. 15 (147 TTABVUE 16).

[10] *Id.*

[11] Bratcher Dep., p. 60 (147 TTABVUE 61).

[12] Bratcher Dep., p. 17 (147 TTABVUE 18).

[13] Bratcher Dep., p. 43 (147 TTABVUE 44).

[14] Cruz Dep, p. 8 (170 TTABVUE 10). *See also* Cruz Dep. pp. 12-13, 15-16 (170 TTABVUE 14-15, 17-18). However, it is "the Mexican state" that owns "the denomination origin tequila." Cruz Dep., pp. 53-54 (170 TTABVUE 55-56); Cruz Dep. p. 56-57 (170 TTABVUE 58-59) (Applicant does not authorize use of the word Tequila; "It is the Mexican government in that in which way issues the authorization, so that a private individual can make use of the denomination of the origin of tequila.").

[15] Cruz Dep., p. 16 (170 TTABVUE 18).

of the tequila."[16] It is responsible for ensuring "that what is commercialized as tequila fulfills the official Mexican norm of tequila."[17]

Applicant's membership includes agave producers, producers/manufacturers, bottlers and distributors of Tequila, a representative of the Mexican Institute of Industrial Property, the General Director of Norms and Standards, the Secretary of Health, and the Secretary of Agriculture, Cattle and Rural Developments, Fish and Food.[18]

> Q. Do the CRT members have an interest ensuring compliance with the Mexican NOM for tequila?
>
> A. Yes because with that they make sure of the authenticity of the tequila, the origin of the tequila, the quality of the tequila and the safety of the tequila.
>
> And with that they make sure the health of the customer, the production and the chain is benefitted because the product is certified and it gives certainty to the authorities that the tequila is a quality product and it is a distinctive product from Mexico.[19]

## IV.  Standing

Standing is a threshold issue which plaintiffs must prove in every *inter partes* case. To establish standing in an opposition or cancellation proceeding, a plaintiff

---

[16] Cruz Dep., p. 26 (170 TTAVUE 28). *See also* Cruz Dep., pp. 55-56 (170 TTABVUE 57-58). The NOM is the Mexican Official Standard that "establishes the characteristics and specifications that all constituents of the Tequila producti[on], industrial and commercial chain must meet, with respect to the processes referred to in the [Tequila specifications]." Official Mexican Standard NOM-006-SCI-2005, Alcoholic Beverages-Tequila-Specifications (102 TTABVUE 113 at 117).

[17] Cruz Dep., pp. 68-69 (170 TTABVUE 70-71).

[18] Cruz Dep., pp. 8-9 (170 TTABVUE 10-11). *See also* Cruz Dep., p. 71 (170 TTABVUE 73)

[19] Cruz Dep., p. 16 (170 TTABVUE 17).

must show "both a 'real interest' in the proceedings as well as a 'reasonable basis' for its belief of damage." *Empresa Cubana Del Tabaco v. Gen. Cigar Co.*, 753 F.3d 1270, 111 USPQ2d 1058, 1062 (Fed. Cir. 2014) (quoting *ShutEmDown Sports, Inc., v. Lacy,* 102 USPQ2d 1036, 1041 (TTAB 2012)); *Ritchie v. Simpson*, 170 F.3d 1092, 50 USPQ2d 1023, 1025 (Fed. Cir. 1999); *Lipton Indus., Inc. v. Ralston Purina Co.*, 670 F.2d 1024, 213 USPQ 185, 189 (CCPA 1982). The Court of Appeals for the Federal Circuit has enunciated a liberal threshold for determining standing in Board proceedings. *Ritchie*, 50 USPQ2d at 1030.

To prove its standing to oppose the registration of an allegedly generic term, a plaintiff may show it is engaged in the manufacture or sale of the same or related goods as those listed in the defendant's application; that is, that plaintiff is in a position to use the term in a descriptive or generic manner. *Frito-Lay N. Am., Inc. v. Princeton Vanguard, LLC,* 109 USPQ2d 1949, 1951 (TTAB 2014), *vacated and remanded on other grounds*, 786 F.3d 960, 114 USPQ2d 1827 (Fed. Cir. 2015); *Sheetz of Del., Inc. v. Doctor's Assocs. Inc.,* 108 USPQ2d 1341, 1350 (TTAB 2013).

Opposer imports and bottles distilled spirits, including Tequila, and bottles spirits containing Tequila as an ingredient, the latter being known in the industry as a "distilled spirit specialty."[20] For example, Opposer sells JUAREZ brand Tequila and a JUAREZ brand distilled spirit specialty comprising triple sec and Tequila, as well as SALVADOR'S MARGARITA, a premixed margarita containing Tequila.[21]

---

[20] Bratcher Dep., p. 20 (147 TTABVUE 21).

[21] Bratcher Dep., pp. 23 and 27 (147 TTABVUE 24 and 28).

Opposer, in its Reply Brief, contends that its use of Tequila in connection with the distilled spirit specialty products does not comply with the Mexican Official Standard for Tequila.[22] Opposer asserts that, upon registration, Applicant will have the ability to interfere with Opposer's use of the term Tequila in connection with its distilled spirit specialty products.[23] In essence, Opposer asserts that the registration of the certification mark would provide Applicant with rights it does not currently possess to control Opposer's use of the term Tequila in connection with products containing "distilled spirits, namely, spirits distilled from the blue tequilana weber variety of agave plant."[24]

Applicant argues that Opposer lacks standing because Opposer may not use the term Tequila unless the product has been certified as Tequila by Applicant.[25] In this regard, David Bratcher, testified that spirits classified as Tequila must have their origin in Mexico[26] and that Applicant certifies as authentic Tequila the product from Opposer's suppliers.[27]

> As admitted by [Opposer], any use of the term TEQUILA on an alcoholic beverage that is not certified by [Applicant] is prohibited by the law in the U.S. Therefore, unless [Opposer] intends to violate the law, it has no 'reasonable

---

[22] 173 TTABVUE 14 (citing Bratcher Dep., p. 59 (147 TTABVUE 60) ("In conjunction with products containing tequila, the NOM and what's required from the federal government of the United States, the TTB differ.")).

[23] 173 TTABVUE 14.

[24] 173 TTABVUE 14.

[25] Applicant's Brief, p. 23 (172 TTABVUE 29).

[26] Bratcher Dep., p. 49 (147 TTABVUE 50).

[27] Bratcher Dep., p. 60 (147 TTABVUE 61).

> basis in fact' to believe that it will be 'damaged' by the granting of the registration requested by [Applicant].[28]

Applicant's argument is essentially that its registration of the certification mark TEQUILA does not change the commercial environment surrounding the importation, bottling, distribution and sale of Tequila. However, Applicant's argument does not address the fact that if the mark is registered, Applicant will not only have the authority to control the use of the TEQUILA mark by others in connection with Tequila based on its purported common law certification mark but registration will entail a new layer of protection and authority under the Trademark Act, to which Opposer must answer, that does not currently exist. *See* Sections 2, 4, 7, 32, 34, 42, and 45 of the Trademark Act, 15 U.S.C. §§ 1052, 1054, 1057, 1114, 1116, 1124, and 1127. For example, registration will afford it the protection of the presumptions set forth in Section 7(b).

In view of the foregoing, we find that Opposer has a real interest in the outcome of the proceeding and a reasonable basis to believe that it would be damaged by the registration of the TEQUILA certification mark and, therefore, Opposer has established its standing. Once Opposer proves its standing on one ground, it has the right to assert any other grounds in an opposition. *See Corporacion Habanos SA v. Rodriquez*, 99 USPQ2d 1873, 1877 (TTAB 2011) (because petitioners alleged standing as to at least one ground, primarily geographically deceptively misdescriptive, they may assert any other legally sufficient claims including those under Section 2(a), the

---

[28] Applicant's Brief, p. 23 (172 TTABVUE 29).

Pan American Convention and fraud); *Enbridge, Inc. v. Excelerate Energy LP*, 92 USPQ2d 1537, 1543 n.10 (TTAB 2009).

## V.    Certification marks

"Certification mark" is defined in Section 45 of the Act, 15 U.S.C. § 1127:

> The term "certification mark" means any word, name, symbol, or device, or any combination thereof—
>
> (1) used by a person other than its owner, or
>
> (2) which its owner has a bona fide intention to permit a person other than the owner to use in commerce and files an application to register on the principal register established by this chapter,
>
> to certify regional or other origin, material, mode of manufacture, quality, accuracy, or other characteristics of such person's goods or services or that the work or labor on the goods or services was performed by members of a union or other organization.

Section 4 of the Trademark Act, 15 U.S.C. § 1054, provides:

> Subject to the provisions relating to the registration of trademarks, so far as they are applicable, collective and certification marks, including indications of regional origin, shall be registrable under this chapter, in the same manner and with the same effect as are trademarks, by persons, and nations, States, municipalities, and the like, exercising legitimate control over the use of the marks sought to be registered, even though not possessing an industrial or commercial establishment, and when registered they shall be entitled to the protection provided in this chapter in the case of trademarks, except in the case of certification marks when used so as to represent falsely that the owner or a user thereof makes or sells the goods or performs the services on or in connection with which such mark is used. Applications and procedure under this section shall conform as nearly as practicable to those prescribed for the registration of trademarks.

In this opposition, TEQUILA purportedly is used to certify, *inter alia,* that the distilled spirits are manufactured in Mexico. As noted in *Cmty of Roquefort v. William Faehndrich, Inc.,* 303 F.2d 494, 497, 133 USPQ 633, 635 (2d Cir. 1962):

> A geographical name does not require a secondary meaning in order to qualify for registration as a certification mark. It is true that section 1054 provides that certification marks are "subject to the provisions relating to the registration of trademarks, so far as they are applicable...." But section 1052(e)(2), which prohibits registration of names primarily geographically descriptive, specifically excepts "indications of regional origin" registrable under section 1054.[29] Therefore, a geographical name may be registered as a certification mark even though it is primarily geographically descriptive.

See also *Tea Bd. of India v. Republic of Tea Inc.,* 80 USPQ2d 1881, 1899 (TTAB 2006) ("we consider DARJEELING inherently distinctive as a certification mark indicating geographic origin as it inherently identifies the geographic source of the tea."). Thus, a geographically descriptive term used or intended to be used as a certification mark is capable of identifying and distinguishing the geographic origin of the goods at issue. Also, the mark must be made available, without discrimination, "to certify the goods … of any person who maintains the standards or conditions which such mark certifies." Section 14(5)(D) of the Trademark Act, 15 U.S.C. §1064(5)(D). *See also Cmty of Roquefort,* 133 USPQ at 635.

---

[29] Section 2(e)(2) of the Trademark Act, 15 U.S.C. § 1052(e)(2), reads in pertinent part that "No trademark by which goods of the applicant may be distinguished from the goods of other shall be refused registration on the principal register on account of its nature unless it . . . (e) Consists of a mark which, . . . (2) when used on or in connection with the goods of the applicant is primarily merely descriptive of them, ***except as indications of regional origin may be registrable under Section 1054 of this title.***" (Emphasis added).

A geographic certification mark is not used by the owner of the mark; rather, the owner of the certification mark controls how others use the mark. The users apply the mark to the goods to indicate to consumers that the goods have been certified as meeting the standards set forth by the certifier (*i.e.,* the owner of the mark). Thus, the goods to which a geographic certification mark is applied may emanate from a number of sources comprising various certified producers in the relevant region. TMEP § 1306.05(a) (October 2016).

## VI. Whether Tequila is a generic term for a type of distilled spirits?

### A. Applicable law for determining whether a term is generic.

It is Opposer's burden to establish that Applicant's mark is generic by a preponderance of the evidence. *Princeton Vanguard, LLC v. Frito-Lay N. Am., Inc.,* 786 F.3d 960, 114 USPQ2d 1827, 1830 n.2 (Fed. Cir. 2015); *Magic Wand Inc. v. RDB Inc.,* 940 F.2d 638, 19 USPQ2d 1551, 1554 (Fed. Cir. 1991) ("Magic Wand had the burden to show by a preponderance of the evidence that the primary significance of the TOUCHLESS mark to the relevant public is the automobile washing service itself, rather than a washing service provided by a particular entity."); *Tea Bd. of India,* 80 USPQ2d at 1887 (TTAB 2006).

There is a two-part test used to determine whether a designation is generic: "First, what is the genus of goods or services at issue? Second, is the term sought to be registered or retained on the register understood by the relevant public primarily to refer to that genus of goods or services?" *Princeton Vanguard,* 114 USPQ2d at 1830 (quoting *H. Marvin Ginn Corp. v. Int'l Ass'n of Fire Chiefs, Inc.,* 782 F.2d 987, 228

USPQ 528, 530 (Fed. Cir. 1986)). This test applies to certification marks with the caveat that a certification mark identifying geographic origin will not be deemed to be a generic term if it retains its ability to designate geographic source.

> A certification mark used to certify regional origin as well as qualities and characteristics associated with the origin will not be deemed to have become a generic term as applied to particular goods unless it has lost its significance as an indication of regional origin for those goods. *See Institut National Des Appellations d'Origine v. Brown-Forman Corp.*, 47 USPQ2d 1875 (TTAB 1998). This can occur when, by virtue of a failure to control the mark, the mark is used on goods which originate somewhere other than the place named in the mark, or on nongenuine goods, or through otherwise uncontrolled use, but only if as a result of such misuse, the mark has come to primarily signify a type of goods with certain characteristics, without regard to regional origin and the methods and conditions for growing it. *See Community of Roquefort v. Faehndrich, Inc.*, [198 F.Supp. 291, 131 USPQ 435 (S.D.N.Y. 1961), *aff'd*, 303 F.2d 494, 133 USPQ 633 (2d Cir. 1962)]; and *In re Cooperativa Produttori Latte E Fontina Valle D'Aosta*, 230 USPQ 131 (TTAB 1986).

*Tea Bd. of India,* 80 USPQ2d at 1887.[30]

---

[30] At the oral hearing, Opposer's counsel challenged this interpretation of the law and asserted that the proper interpretation of the law is a determination of the primary significance of the term at issue and not whether the term has lost its significance as a designation of geographic origin. However, it is clear that unlike a trademark that identifies and distinguishes a single source, a certification mark appears on the products of several "sources" which are certified so as to designate geographic origin. As such, the focus cannot be on what the primary meaning of the term is to consumers and whether that meaning is geographic or non-geographic. Certification marks of regional origin can have both meanings to consumers. Instead, the focus must be whether the certification mark has lost its significance as a designation of geographic origin. In many instances the product is called by the term comprising the certification mark, not because the term represents the genus of the goods but because the term represents the collective products from that region that are controlled by the certifier.

The public's perception is the primary consideration in determining whether a term is generic. *Loglan Inst. Inc. v. Logical Language Grp. Inc.*, 902 F.2d 1038, 22 USPQ2d 1531, 1533 (Fed. Cir. 1992); *Tea Bd. of India,* 80 USPQ2d at 1887. Evidence of the public's understanding of a term may be obtained from any competent source, including testimony, surveys, dictionaries, trade journals, newspapers and other publications. *Loglan Inst.*, 22 USPQ2d at 1533; *Dan Robbins & Assocs., Inc. v. Questor Corp.*, 599 F.2d 1009, 202 USPQ 100, 105 (CCPA 1979); *Tea Bd. of India,* 80 USPQ2d at 1887.

**B. The genus of the goods.**

The category of goods is distilled spirits; specifically, "spirits distilled from the blue tequilana weber variety of agave plant." *Magic Wand*, 19 USPQ2d at 1552 ("[A] proper genericness inquiry focuses on the description of services set forth in the certificate of registration."). *See also In re Trek 2000 Int'l Ltd.,* 97 USPQ2d 1106, 1112 (TTAB 2010) ("the genus of goods at issue in this case is adequately defined by applicant's identification of goods . . . .").[31]

**C. The relevant public.**

The second part of the genericness test is whether the relevant public understands the designation primarily to refer to that class of goods. The relevant public for a

---

[31] Because Opposer identified purchasers of hard liquor as the universe of respondents for its consumer survey, discussed *infra,* and Opposer's argument, in its Reply Brief, that "there is no such thing as 'TEQUILA Agave Spirits'" (173 TTABVUE 9), we assume that Opposer identifies the genus as hard liquor products or spirits in general, rather than "spirits distilled from the blue tequilana weber variety of agave plant." Nevertheless, it is "spirits distilled from the blue tequilana weber variety of agave plant," a subcategory of hard liquor, that is at issue in this proceeding.

genericness determination is the purchasing or consuming public for the identified products (*i.e.,* "spirits distilled from the blue tequilana weber variety of agave plant"). *Magic Wand,* 19 USPQ2d at 1553 (citing *In re Montrachet S.A.,* 878 F.2d 375, 11 USPQ2d 1393, 1394 (Fed. Cir. 1989)); *In re Merrill Lynch, Pierce, Fenner, & Smith, Inc.,* 828 F.2d 1567, 4 USPQ2d 1141, 1143 (Fed. Cir. 1987); *H. Marvin Ginn Corp.,* 228 USPQ at 530; *Dan Robbins & Assocs., Inc.*, 202 USPQ at 105 (CCPA 1979). The relevant public, therefore, is purchasers of "spirits distilled from the blue tequilana weber variety of agave plant." *See In re Newbridge Cutlery Co.*, 776 F.3d 854, 113 USPQ2d 1445, 1449 (Fed. Cir. 2015) ("the relevant public is the purchasing public in the United States of these types of goods."). Purchasers of hard liquor or distilled spirits *per se* is too broad because a purchaser of one kind of distilled spirits (*e.g.*, single malt Scotch whisky) may not be a purchaser of "spirits distilled from the blue tequilana weber variety of agave plant."[32]

### D. Public perception.

#### 1. Federal Regulations[33]

As of 1969, 27 C.F.R. § 5.21(h) provided that Tequila was a generic term.[34]

---

[32] For purposes of the relevant analysis, Donn Lux, Opposer's Chairman and CEO, is incorrect in his opinion that the relevant public includes "anybody who knows about any kind of spirit products. It could be a distributor, it could be a retailer, it could be somebody who doesn't drink at all, it could be somebody in a restaurant. The relevant public, to me, that means anybody and everybody." Lux Discovery Dep., p. 28 (101 TTABVUE 31).

[33] Pursuant to 26 U.S.C. § 5301, the Secretary of the Treasury is authorized "to regulate the kind, size, branding, marketing, sale, resale, possession, use and reuse of containers . . . designed or intended for use for the sale of distilled spirits . . . for other than industrial use."

[34] Opposer's second notice of reliance, Exhibits A-E (88 TTABVUE 9-25). *See also* McMonagle Dep., Exhibit 1 (128 TTABVUE 65 at 67).

> (h) Class 8. Geographical designations.
>
> (2) Only such geographical names for distilled spirits as the Administrator finds have by usage and common knowledge lost their geographical significance to such extent that they have become generic, shall be deemed to have become generic. The following are examples of distinctive types of distilled spirits with geographical names that have become generic: London dry gin, Geneva gin, Hollands gin, Tequila.[35]

*See also* Federal Register, Vol 34, No. 248 (December 30, 1969) which reads, in pertinent part as follows:

> It is believed that the inclusion of the requirement concerning raw materials used and a requirement that the product possess the taste, aroma, and characteristics generally attributed to "Tequila" will afford sufficient protection to the consumer without limiting the product to a geographic origin.[36]

However, in 1973, the U.S. Department of Treasury, Bureau of Alcohol, Tobacco and Firearms ("BATF," now the Alcohol and Tobacco Tax and Trade Bureau ("TTB")) recognized Tequila as a distinctive product of Mexico.[37]

Explanation of Amendments

> The purpose of these amendments is to change the official standard of identity for Tequila to make Tequila a

---

[35] Opposer's second notice of reliance, Exhibit A (88 TTABVUE 9).

[36] Opposer's second notice of reliance, Exhibit E (88 TTABVUE 23-24).

[37] Opposer's second notice or reliance, Exhibit F (88 TTABVUE 27). The current federal regulation regarding geographic designations, 27 C.F.R. § 5.22(k)(2), does not include Tequila. It reads as follows:

> Only such geographical names for distilled spirits as the appropriate TTB officer finds to have by common usage and common knowledge lost their geographical significance to such extent that they have become generic shall be deemed to have become generic. Examples are London dry gin, Geneva (Hollands) gin.

> distinctive product of Mexico. This will mean that after these amendments become effective, the term "Tequila" may not be used commercially in the United States to describe any product not manufactured in Mexico in compliance with the applicable laws of that country. This is identical to the protection already afforded to such terms as "Cognac", "Scotch whiskey", "Irish whiskey", and "Canadian whiskey".[38]

*See* 27 C.F.R. § 5.22 which sets forth the "standards of identity" for distilled spirits, including Tequila.

> **(g)** *Class 7; Tequila.* "Tequila" is an alcoholic distillate from a fermented mash derived principally from the Agave Tequilana Weber ("blue" variety), with or without additional fermentable substances, distilled in such a manner that the distillate possesses the taste, aroma, and characteristics generally attributed to Tequila and bottled at not less than 80° proof, and also includes mixtures solely of such distillates. Tequila is a distinctive product of Mexico, manufactured in Mexico in compliance with the laws of Mexico regulating the manufacture of Tequila for consumption in that country.[39]

*See also* 27 C.F.R. § 5.42 which prohibits bottle labels from containing any false statements (*e.g.,* labeling a product as Tequila that is not from Mexico).

> § 5.42 Prohibited practices.
>
> (a) *Statements on labels.* Bottles containing distilled spirits, or any labels on such bottles, or any individual covering, carton, or other container of such bottles used for sale at retail, or any written, printed, graphic, or other matter accompanying such bottles to the consumer shall not contain:
>
> (1) Any statement that is false or untrue in any particular, or that, irrespective of falsity, directly, or by ambiguity, omission, or inference, or by the addition of irrelevant,

---

[38] *Id.*

[39] *See also* McMonagle Dep. Exhibit 1 (128 TTABVUE 65 at 68) ("This standard of identity remains in effect in current US regulations.").

scientific or technical matter, tends to create a misleading impression.

Thus, the TTB is charged with regulating the sale of distilled spirits in the United States. TTB has classified Tequila as a distinctive product of Mexico and it prohibits bottles from being labeled Tequila if the distilled spirit is not manufactured in Mexico in compliance with the laws of Mexico. TTB regulations are probative in determining whether a term is distinctive or generic. *See Institut National Des Appellations D'Origine v. Vintners Int'l Co.,* 958 F.2d 1574, 22 USPQ2d 1190, 1196 (Fed. Cir. 1992) ("Support for this 'generic' determination is found in . . . BATF regulations."). Thus, those in the trade presumptively are aware that Tequila is distilled and exported only from Mexico and that distilled spirits labeled as Tequila are controlled by an arm of the Mexican government. David Bratcher, Opposer's President and Chief Operating Officer testified that spirits classified as Tequila must have their origin in Mexico[40] and that Applicant certifies as authentic Tequila the product from Opposer's suppliers.[41] However, just because the regulations of the TTB recognize Tequila as having geographic significance does not establish how Tequila is perceived by purchasers of Tequila, other than those subject to or otherwise aware of those rules and regulations, or that end consumers would perceive Tequila to be a distilled spirit that comes from Mexico. *See also Institut National Des Appellations D'Origine,* 22 USPQ2d at 1195 (because "Chablis" has some geographic significance does not establish how American consumers of wine perceive it). *Compare Tea Bd. of India,* 80

---

[40] Bratcher Dep., p. 49 (147 TTABVUE 50).

[41] Bratcher Dep., p. 60 (147 TTABVUE 61).

USPQ2d at 1895 (TTAB 2006) (it is not reasonable to conclude from the survey that those who did not identify Darjeeling as a tea from India did not know it was a tea from India).

**2. Dictionary definitions of the word Tequila, encyclopedia entries and other information sources.**

a. Allwords.com derived from Wiktionary.org

An alcoholic beverage from the fermented juice of the Central American century plant Agave tequilana.[42]

b. *Cambridge English Dictionary* (Cambridge.org/us)

A strong alcoholic drink originally from Mexico.[43]

c. *Webster's Revised Unabridged Dictionary* (1913)

An intoxicating liquor made from the maguey in the district of Tequila, Mexico.[44]

d. Dictionary.com based on *The Random House Dictionary* (2015)

A strong liquor from Mexico, distilled from fermented mash of an agave.[45]

---

[42] Opposer's second rebuttal notice of reliance (122 TTABVUE 6). *See also* Wiktionary.org (122 TTABVUE 11-12). This is the verbatim definition from Yahoo Online Education Dictionary based on the *American Heritage Dictionary of the English Language* (4th ed. 2000) relied on by Dr. Ronald Butters in his expert report. Butters Dep., Exhibit 1 (130 TTABVUE at 105).

[43] Opposer's second rebuttal notice of reliance (122 TTABVUE 8).

[44] Applicant's seventh notice of reliance (109 TTABVUE 8).

[45] Applicant's seventh notice of reliance (109 TTABVUE 10). *See also* Random House Webster's Unabridged Dictionary (2nd ed. 1986) (109 TTABVUE 14); Butters Dep., Exhibit 1 (130 TTABVUE at 106).

e. ***Webster's Third New International Dictionary of the English Language Unabridged*** (1971)

A Mexican liquor made by redistilling mescal.[46]

f. ***New Oxford American Dictionary*** (2nd ed. 2005)

A Mexican liquor made from an agave.[47]

g. John Mariani, ***The Dictionary of American Food and Drink*** (1994)

**tequila**. A liquor distilled from the Central American blue agave … plant. The name comes from the Tequila district of Mexico, where the best tequila traditionally is made. The word first printed in English in 1849, and the Bureau of Alcohol, Tobacco and Firearms recognized tequila as a distinctive product of Mexico in September 1975.[48]

h. ***Dictionary of Wines and Spirits*** (1980)

Tequila . . . this is a Mexican drink, made by fermenting the cooked hearts or 'pines' of the Maguey, or *Agave tequilano. …*[49]

i. Wikipedia

**Tequila** . . . is a regional specific name for a distilled beverage made from the blue agave plant, primarily in the area surrounding the city of Tequila . . . northwest of Guadalajara, and in the highlands (*Los Altos*) of the north western Mexican state of Jalisco . . . .

\* \* \*

---

[46] Applicant's seventh notice of reliance (109 TTABVUE 18). *See also* Butters Dep., Exhibit 1 (130 TTABVUE at 106).

[47] Butters Dep., Exhibit 1 (130 TTABVUE at 105).

[48] Butters Dep., Exhibit 1 (130 TTABVUE at 106).

[49] Applicant's ninth notice of reliance (111 TTABVUE 36).

Mexican laws state that tequila can only be produced in the state of Jalisco and limited municipalities in the states of Guanajuato, Michoacán, Nayarit, and Tamaulipas.[50]

### j. *Encyclopaedia Britannica* (2005)

**tequila**

distilled liquor, usually clear in colour and unaged, that is made from the fermented juice of the Mexican agave plant, . . . The beverage, which was developed soon after the Spaniards introduced distillation to Mexico, is named for the town of Tequila in the Mexican state of Jalisco where it is produced.[51]

### k. *Webster's Collegiate Encyclopedia* (2010)

**tequila** Distilled liquor, usually clear in color and unaged, made from the fermented juice of the Mexican agave plant . . . [i]t was developed soon after the Spaniards brought distillation to Mexico, and is named from the town of Tequila.[52]

Of the eight dictionary definitions made of record, five define Tequila as an alcoholic beverage from Mexico (*e.g.*, strong liquor from Mexico, Mexican liquor, made from the maguey in the district of Tequila, Mexico, etc.), two identify Mexico as the origin of Tequila, and one simply identifies Tequila as an alcoholic beverage. Two of the encyclopedia entries identify Tequila as an alcoholic beverage from Mexico and one identifies Mexico as the origin of Tequila. Despite the fact that these references do not expressly state that Tequila is distilled exclusively in Mexico, they tend to

---

[50] Applicant's seventh notice of reliance (109 TTABVUE 20).

[51] Applicant's seventh notice of reliance (109 TTABVUE 32). *See also* Butters Dep., Exhibit 1 (130 TTABVUE at 110).

[52] Butters Dep., Exhibit 1 (130 TTABVUE at 110-111).

show that consumers would perceive that Tequila is a Mexican alcoholic beverage.[53]

*See Blackhorse v. Pro-Football, Inc.,* 111 USPQ2d 1080, 1085 n.15 (TTAB 2014) (dictionary definitions with a usage characterization may be evidence of the general perception of a term), *aff'd Pro-Football, Inc. v. Blackhorse,* 113 USPQ2d 1749 (E.D. Va. 2014); *Tea Bd. of India,* 80 USPQ2d at 1895.

Opposer also introduced the relevant prosecution history of 21 third-party applications, of which nine subsequently registered, where the USPTO required that the applicant disclaim the exclusive right to use the term Tequila on the ground that

---

[53] Our finding of fact differs from that of Dr. Butters, Opposer's expert linguist. According to Dr. Butters "the basic - - the dictionary meaning, the meaning of tequila is an alcoholic liquor distilled or made from plant juice, basic ingredient is century plant, agave." Butters Dep., p. 34 (130 TTABVUE 35). Although "there's a general association of tequila with Mexico . . . it's ambiguous as to whether this is in any way exclusive." Butters Dep., p. 36 (130 TTABVUE 37). Dr. Butters focused on "the meaning of tequila as appropriate for a dictionary meaning" (Butters Dep., p. 22 (130 TTABVUE 23)), while we focus on what consumers of Tequila take away from the dictionaries and other reference works. According to Dr. Butters,

> The meaning is the definition [distilled liquor], then the relationship to Mexico is real-world information or etymological information, not part of the meaning, and indeed it is part of the meaning that the encyclopedia - - part of a description of tequila that the reader is given assuming that this is stuff that the reader might not know.

Butters Dep., p. 45 (130 TTABVUE 46).

Also, Dr. Butters likened the definitions of Tequila to the definitions of vodka. Butters Dep. p. 39 (130 TTABVUE 40). However, the definitions of Tequila are more akin to the definitions of Cognac (*e.g.,* a kind of brandy that is made in France, high-quality brandy . . . from Western France), a recognized geographic indicator. *See* Dictionary.com based on the **Random House Dictionary** (2016), Merriam-Webster (merriam-webster.com), **Cambridge Academic Content Dictionary** (Cambridge.org/us), and **Encyclopaedia Britannica**. The Board may take judicial notice of dictionary definitions, including online dictionaries and encyclopedias that exist in printed format. *In re Cordua Rests. LP*, 110 USPQ2d 1227, 1229 n.4 (TTAB 2014), *aff'd* 823 F.3d 594, 118 USPQ2d 1632 (Fed. Cir. 2016); *B.V.D. Licensing Corp. v. Body Action Design Inc.*, 846 F.2d 727, 6 USPQ2d 1719, 1721 (Fed. Cir. 1988); *Threshold.TV Inc. v. Metronome Enters. Inc.*, 96 USPQ2d 1031, 1038 n.14 (TTAB 2010).

it is a generic term.[54] Tequila was identified in the description of goods in eight of the registered marks. "Such third party registrations show the sense in which the word is used in ordinary parlance and may show that a particular term has descriptive significance as applied to certain goods or services." *Institut National Des Appellations D'Origine,* 22 USPQ2d at 1196. *See also* TMEP §1306.05(c) (the fact that the term is commonly used to identify goods or services in third-party registrations may further support the conclusion that it is viewed in the relevant marketplace as generic, rather than as an indication of geographic origin). On the other hand, all of the registrants for marks consisting in part of the word Tequila are approved by Applicant as selling authentic Tequila.[55] Also, there is no evidence regarding how the

---

[54] 91-93 TTABVUE.

[55] Applicant's response to Opposer's interrogatory No. 15 (95 TTABVUE 14). *See also* Applicant's response to Opposer's request for admission No. 14 admitting that "some U.S. entities which sell certified TEQUILA include the word TEQUILA in their brand name." (95 TTABVUE 30).

The prosecution history of the Application is in accord with Applicant's interrogatory response and admission. In the July 28, 2006 Office Action, the Trademark Examining Attorney reviewing the subject application for TEQUILA noted that there were "close" to 50 registrations including the word Tequila and required Applicant to state whether the registrants were authorized users of the mark. In its February 1, 2007 response, Applicant provided lists of certified producers and authorized bottlers and stated that the owners of the registrations cited by the Examining Attorney "appear to be certified users." The Trademark Examining Attorney was not satisfied with Applicant's response and required Applicant to "conclusively establish legitimate control over use of the mark" by submitting "evidence to show that all of the cited Registrations that include the proposed mark are owned or controlled by certified users." July 23, 2007 Office Action. In its January 23, 2008 Response, Applicant submitted "evidence showing its legitimate control over the use of TEQUILA in substantially all of the cited registrations." In the March 28, 2008 Office Action, the Trademark Examining Attorney required Applicant to prove that three additional registrants and one applicant were authorized users. Applicant submitted the requested evidence in its September 30, 2008 Response. For purposes of examination, the USPTO was satisfied that all of the registrations for Tequila marks were related to Tequila authorized by Applicant. Pursuant to Trademark Rules 2.122(b)(1), the entire application file is

USPTO has treated other geographic designations for distilled spirits, such as Cognac,[56] Scotch,[57] Bourbon,[58] *etc.,* that would allow us to assess how the USPTO has considered the term Tequila during trademark prosecution vis-à-vis how the USPTO had considered other geographic designations.

With respect to consumer research, Applicant, through its expert Dr. Bruce Isaacson, Ph.D., introduced the results of three Internet searches conducted on the GOOGLE search engine.[59] The result summaries for the searches are listed below:

---

automatically part of the record. *See Cold War Museum, Inc. v. Cold War Air Museum, Inc.,* 586 F.3d 1352, 92 USPQ2d 1626, 1628 (Fed. Cir. 2009).

We further note that Opposer did not include the above-noted statements and submissions in its extensive list of asserted factual misrepresentations comprising Opposer's fraud claim, nor did Opposer argue in its Brief that such statements constitute fraud.

[56] Cognac "is a grape brandy distilled in the Cognac region of France, which is entitled to be so designated by the laws and regulations of the French government." 27 C.F.R. § 5.22(d)(2).

[57] "'Scotch whisky' is a whisky which is a distinctive product of Scotland, manufactured in Scotland in compliance with the laws of the United Kingdom regulating the manufacture of Scotch whisky for consumption in the United Kingdom." 27 C.F.R. § 5.22(b)(7).

[58] "'Whisky distilled from bourbon . . . mash' is whisky produced in the United States." 27 C.F.R. § 5.22(b)(2).

[59] A list of Internet search results generally has little probative value, because such a list often does not contain sufficient surrounding text to show the context in which the term is used on the listed web pages. *See In re Bayer AG*, 488 F.3d 960, 967, 82 USPQ2d 1828, 1833 (Fed. Cir. 2007) (deeming Google® search results that provided very little context of the use of ASPIRINA to be "of little value in assessing the consumer public perception of the ASPIRINA mark"); *In re Tea and Sympathy, Inc.*, 88 USPQ2d 1062, 1064 n.3 (TTAB 2008) (finding truncated Google® search results entitled to little probative weight without additional evidence of how the searched term is used). Nevertheless, we consider Applicant's evidence for whatever probative value it has because it has been introduced through an expert report. *See Alcatraz Media Inc.*, 107 USPQ2d at 1759 (results from search engine introduced by testimony admissible but of limited probative value because they lack sufficient context); *Miller v. Miller*, 105 USPQ2d 1615, 1617-18 (TTAB 2013) (search results summary introduced by testimony have probative weight to the extent the results include sufficient information surrounding the term searched to show context, that Miller is a surname, and have been supplemented by other testimony). We only consider what Applicant introduced and not what the links on the search results would have shown because those websites were not introduced into evidence. *See In re HSB Solomon Assocs. LLC*, 102 USPQ2d 1269, 1274 (TTAB 2012) (stating that "a reference to a website's internet address is

- Six of 25 search summaries for Tequila referenced Mexico in some way;[60]

- Fourteen of 25 search summaries for "Where is tequila made?" referenced Mexico or a Mexican city or state;[61] and

- Ten of 25 search summaries for "Where is tequila produced?" referenced Mexico or a Mexican city or state.[62]

Dr. Isaacson concluded "that a consumer who searches for 'tequila' online would see that tequila is made in Mexico, and a consumer who searches on the other two search terms would see that tequila is made in Mexico."[63] Since Tequila is made in Mexico and because all Tequila sold in the United States must come from Mexico, it is not surprising that the results from online searches associate Tequila with Mexico. In view of the foregoing, we find that Tequila is associated with Mexico.

### 3. Advertising

Opposer engaged Gary B. Wilcox, Ph.D., a professor of advertising at the University of Texas, "to see if there was a comprehensive communication attempt by an organization or brand or company to communicate that all tequila was made in

---

not sufficient to make the content of that website or any pages from that website of record"); *Safer Inc.*, 94 USPQ2d at 1039 (noting that because of the transitory nature of Internet postings, websites referenced only by links may later be modified or deleted).

[60] 100 TTABVUE 725-727.

[61] 100 TTABVIUE 728-730.

[62] 100 TTABVUE 731-733. There were 11 search summaries referencing Mexico but hit Nos. 7 and 8 are based on the same URL.

[63] 100 TTABVUE 616. Dr. Isaacson testified that his research did not address whether U.S. consumers actually access this information or whether they care where Tequila originates. Isaacson Dep., p. 40 (100 TTABVUE 773).

Mexico."[64] Dr. Wilcox analyzed "distilled spirits advertisements" to see "what was being communicated with tequila advertising."[65] According to Dr. Wilcox, consumers do not exercise a high degree of care when purchasing Tequila and they would not care about the geographic origin of their Tequila.[66]

> Q. And based on your prior advertising and marketing experience, are consumers of low involvement products generally likely to be aware of geographic origin information?
>
> A. Generally not. Most of the advertising and promotions and marketing you see for low involvement products center around the idea of quick communication of positive images, positive brand association, and that generally is what drives purchase and then the formation of attitudes later on in that process.
>
> Q. Okay. And what types of advertising appeals in your experience are used in connection with low involvement products like tequila?
>
> A. Images that communicate quickly in an ad. If you look across alcohol categories, you generally see ads that try to gain favorable impression, positive response from the consumer. That positive response translates to an evaluation of the brand.[67]
>
>                    \*         \*         \*
>
> Q. Okay. In your experience in the field of advertising, what types of things usually reflect the primary

---

[64] Wilcox Dep., p. 6 (143 TTABVE 7). Subsequently, Dr. Wilcox explained that he "looked at the information sources in the United States to determine if there was a messaging or comprehensive attempt on behalf of a company, a brand, or organization to communicate that all tequila was made in Mexico." Wilcox Dep., p. 8 (143 (TTABVUE 9).

[65] Wilcox Dep., p. 12 (143 TTABVUE 13).

[66] Wilcox Dep., p. 13 (143 TTABVUE 14).

[67] Wilcox Dep., p. 14 (143 TTABVUE 15).

purpose of ads for low involvement products like alcoholic beverages?

A. I would say, again, very pleasurable images that communicate quickly, ads that don't have a lot of detail in them, as an example, they just communicate really primarily the brand, because it's about a brand selection.

Q. Is geographic origin generally important to that purpose?

A. I wouldn't think so.[68]

According to Dr. Wilcox, in this marketing environment, Tequila advertisements would not feature any factual product information, such as the geographic origin of the product.[69] Dr. Wilcox testified that his review of 20 advertisements in *Rolling Stone* and *Gentlemen's Quarterly* magazines corroborated his testimony;[70] that is, the dominant advertising message was the quality of the brand.[71]

We first observe that there is no evidentiary basis for Dr. Wilcox's sweeping statement that consumers do not care about geographic origin. Moreover, any lack of focus on geographic origin in advertising could also be because the geographic origin is commonly known and does not serve to distinguish brands, so that advertisers spend their budgets on touting other aspects to distinguish their brand.

The 20 advertisements Dr. Wilcox reviewed featured four brands of Tequila all with Spanish language wording or names in the marks (Don Julio, Patron, Jose

---

[68] Wilcox Dep., p 15 (143 TTABVUE 16).

[69] Wilcox Dep., p. 15 (143 (TTABVUE 16)

[70] Wilcox Dep. pp. 16, 18, 20, 38 (TTABVUE 17, 19, 21, 39).

[71] Wilcox Dep., p. 20 (TTABVUE 21).

Cuervo, and Cabo Uno).[72] One of the Don Julio advertisements has a Mexican theme,[73] another has the tag lines "The True Flavor of Mexico Isn't Found In a Book" and "Taste the Mexico You Don't Know,"[74] and the Jose Cuervo advertisements have the tag line "Vive Cuervo."[75] Notwithstanding the testimony of Dr. Wilcox, we find that these advertisements deliberately make a linkage to the country of Mexico.

Assuming that Dr. Wilcox accurately assessed the Tequila marketing environment, we would not expect Tequila advertisers to focus on factual information such as the geographic origin of the product which, in any event, consumers may already know. Moreover, Dr. Wilcox's statement that the advertisements do not feature geographic origin is contradicted by the numerous examples that clearly create an association with Mexico. Thus, the fact that the advertising does not highlight or stress the legal significance of geographic origin is not particularly probative as to whether consumers understand that Tequila comes from Mexico or whether Tequila has lost its significance as a designation of geographic origin. There is no comparable advertising of record for Cognac, Scotch, Bourbon, *etc.* to demonstrate that purveyors of other distilled spirits and wine highlight geographic

---

[72] 144 TTABVUE 8-27. The advertising study conducted by Opposer's expert, Dr. Bruce Isaacson, Ph.D., utilized six brands that accounted for 77% of the Tequila sales in the United States. Those brands were Jose Cuervo, Patron, Sauza, Juarez, Montezuma, and 1800. 100 TTABVUE 611. Of those six brands, all but 1800 have Spanish language words or names (Montezuma is the Spanish version of an Aztec name).

[73] 144 TTABVUE 8.

[74] 144 TTABVUE 10.

[75] 144 TTABVUE 11, 15, 18, 20. See also the advertisements attached to the Isaacson expert report which included advertisements published in other magazines such as *Maxim, Cosmopolitan, ESPN the Magazine*, and others. 100 TTABVUE 648-723.

origin in their advertisements, thus demonstrating that the purported choice of Tequila producers and bottlers to expressly highlight or emphasize the geographic origin of their product is significant.[76] What the evidence does show, at minimum, is that much advertising deliberately creates an association with Mexico.

### 4. Bottle labels

Dr. Wilcox also reviewed Tequila labels[77] and concluded that in the Tequila marketing environment, customers are not paying attention to the information on the label, other than the brand.[78] "[G]enerally, the brand was predominant, with most of the other information secondary."[79] However, we note that the labels of all the brands state that the Tequila is made in Mexico[80] and most of the brands have Spanish language words, places or names (*e.g.*, Juarez, Jose Cuervo, Puerto Vallarta, and Sauza).[81] The Patron bottle hang tag highlights its Mexican origin.

> Patrón Tequila, like the great wines and cognacs of the world, is exceptional for a reason. It begins with the finest growing region in Mexico. High in the mountains of Jalisco exists a region with perfect soil and climate . . . .[82]

---

[76] Dr. Wilcox did not look at advertisements for Cognac, Champagne or Bordeaux wine. Wilcox Dep. p. 39 (143 TTABVUE 40).

[77] Wilcox Dep., p. 22 (143 TTABVUE 23).

[78] Wilcox Dep., p. 24 (143 TTABVUE 25).

[79] Wilcox Dep., p. 25 (143 TTABVUE 26).

[80] 144 TTABVUE 2-3.

[81] 144 TTABVUE 2-3. Dr. Bruce Isaacson, Ph.D., made the same observations in his expert report. 100 TTABVUE 604-605, 610-612, 628-646. "Even if such information [the Spanish sounding names and statement that the product comes from Mexico] is not the central focus of an ad or label, it is available to the consumer and should not be ignored by an analysis that seeks to understand whether consumers know that tequila comes from Mexico." 100 TTABVUE 611.

[82] 100 TTABVUE 646. The remainder of the label is illegible.

### 5. Use of Tequila in printed publications and on the Internet

### a. Recipes

Opposer introduced 17 recipes posted on the Internet in websites such as Foodnetwork.com, Finecooking.com, MarthaStewart.com, etc., for recipes consisting in part of Tequila.[83] For example, "Grilled Pound Cake with Tequila-Soaked Pineapple,"[84] "Nantucket Bay Scallops in Tequila, Citrus, and Chile Dressing,"[85] and "Sauteed Turkey with Tequila Cream Sauce."[86] Opposer asserts that "[r]ecipes can show how a term is used and understood."[87] The term Tequila is used as the name of an ingredient in the recipes (*e.g.*, "In a small saucepan, whisk together the brown sugar, tequila and ¼ cup water.").[88] Although none indicate the geographic origin of Tequila, there is no evidence that recipes typically recite the geographic origin of the ingredients comprising the recipe.[89] Thus, the recipes do not show that consumers are unaware of the geographic origin of Tequila.

---

[83] Opposer's third notice of reliance (89 TTABVUE).

[84] 89 TTABVUE 7.

[85] 89 TTABVUE 11.

[86] 89 TTABVUE 14.

[87] Opposer's Brief, p. 32 (167 TTABVUE 33).

[88] 89 TTABVUE 7.

[89] 89 TTABVUE 33-45. Neither party introduced any recipes including Cognac, Scotch, Bourbon, or other known designations of geographic origin for purposes of comparison. Thus, it is not clear whether cooks and recipe writers simply presume their readers are generally aware that spirits and wines originate from particular geographic areas, so that no mention of geographic origin is necessary, or whether the cooks and recipe writers tend to designate use of spirits and wines having a particular geographic origin as preferable when preparing the recipe.

### b. News articles

Opposer introduced ten articles published in newspapers using the term Tequila to identify a type of distilled spirit without any reference to Tequila being a geographic indicator.[90] The article "TNT wooed Charles Barkley with $1,700 of wine and tequila" published May 19, 2015 in the Chicago Sun Times, excerpted below, is representative.

> There had been whispers that Charles Barkley would leave TNT when his contract was up in 2016.
>
> That talk was killed recently-along with some bottles of wine and tequila totaling $1,700.
>
> \*　　　\*　　　\*
>
> On the issue of Barkley, [Kenny] Smith took a nice shot at his on-air colleague and sparring partner. "I never believed he would retire," said Smith. "He fooled David Levy and got two bottles of good wine and tequila out of it."[91]

The author refers to Tequila in the same manner as he refers to wine, as a generic term. We find evidence of this type to be inconclusive. Just because the author referred to the term Tequila as a distilled spirit, we cannot conclude from the articles that the authors and readers did not perceive Tequila as a distilled spirit from Mexico.

Applicant, on the other hand, introduced into evidence numerous news articles associating Tequila with Mexico.[92] The following articles are illustrative:

---

[90] 94 TTABVUE.

[91] 94 TTABVUE 18.

[92] 107, 108, 110 and 111 TTABVUE. We considered only articles from U.S. publications because there was no evidence or testimony that U.S. purchasers of Tequila would read the foreign publications (*e.g., City A.M.* from London 107 TTABVUE 15).

a. *Delta Sky Magazine* (delta-sky.com)[93]

Evidence of the Culture

It was once considered just a campesino's drink, but now tequila has gone upscale.

Tequila is to Mexico, a friend once alleged, as apple pie is to America. It is as much a part of the national identity of Mexico as mariachis or the art of Diego Rivera. It is also the national elixir, the stuff of celebration and the cure for what ails you. If a friend drops by, you offer a tequila. If you feel the flu coming on, a tequila, if you feel a little blue, tequila, and at a fiesta, nothing else … tequila. Speak Spanish, and Mexicans will admire you; but order a tequilito, neat and sipped, and they will love you.

b. The New York Times[94]

100% Blue Agave, the V.S.O.P. of Tequila

Tequila, unlike chocolate, was not an indigenous Mexican treat. The Spanish conquerors who knew how to distill spirits taught the Mexicans to turn the fermented juice of the agave plant into tequila.

Today, genuine tequila comes only from a limited area around Jalisco, Mexico, north of Guadalajara. It must be made with at least 51 percent blue agave juice, and double-distilled – and there is never a worm in the bottle. The bottles with worms contain mescal, a less refined cousin of tequila that is usually made around Oaxaca, south of Mexico City.

Only in the last few years have some of the finer Mexican tequilas been available here. As with other categories of spirits like Scotch, there is a new emphasis on high-quality products. …

---

[93] 107 TTABVUE 7.

[94] 107 TTABVUE 12.

… For sipping as an aperitif, Mexican connoisseurs prefer chilled shots of fine 100 percent blue agave silver tequilas or the smoother reposados, which have been aged.

c. Wine Enthusiast Magazine (winemag.com)[95]

Slideshow Story: Taking On Tequila

… Wine lovers know the thrill, the enchantment, of enjoying wine within sight of where the grapes grow. But you can enjoy Burgundy in Burgundy, Chianti in Chianti, while for the Tequila geek there is only one pilgrimage to make: Jalisco, the state in central-western Mexico where 95% of agave is grown and the spirit of Tequila is produced.

\* \* \*

The Tequila Trail, whose towns and distilleries have been designated a UNESCO World Heritage Site, is a three-hour drive west from the bustling coastal resort, Puerto Vallarta, and winds its way through the lowlands region. The trail connects the Tequila-producing towns of El Arenal, Amatian, Tequila, Magdalena and Teuchitlan.

\* \* \*

… The history of Tequila is deeply ingrained in the history of Mexico, and there is much national pride in the spirit.

During the prosecution of the subject application, the Trademark Examining Attorney for the subject application submitted an Associated Press news article posted on MSNBC.msn.com on November 2003 discussing South Africa's agave distillers.[96] The news article displays mixed use of the term Tequila.

First tequila from outside Mexico

S. Africa's Agava [sic] fills demand while Mexican plantations recover from disease . . .

---

[95] 107 TTABVUE 20.

[96] October 19, 2004 Office Action.

. . . a group of cactus juice distillers has taken a page out of Mexico's book and started making tequila . . .

Mexican diplomats used international trade agreements to ensure the South Africans did not actually call their drink tequila, but their "Agava" branded spirit has the same taste as leading brands, and bottles are flying off the shelves.

\* \* \*

"Tequila can only be made in Mexico for the same reasons as port, sherry and champagne," [Roy McLachlan, managing director of Agave Distillers] added. "Other than that . . . the components are the same." To carry any of these names, the drink in question must come from a specific region or country.

Trade agreements mean similar drinks made elsewhere cannot carry the name, even if they are made in exactly the same way.

The Trademark Examining also submitted an excerpt from the LasMagaritas.com

website stating the following:

Tequila is best identified with Mexico, and more specifically it is identified regionally with the Mexican state of Jalisco. In four other regions of Mexico (Guanaju[a]nto, Michoc[á]n, Nayarit and Tamaulipas), tequila is made out of a variety of magueys (including agave, mezcal or maguey), but the truest definition of the product restricts it – in the same way the French define a bottle of Champagne as the product of the Champagne region of France – to the Jalisco region and to the agave plant.[97]

*See also* the posting on the CocktailTimes.com website set forth below:

DISTILLERY JOURNEY

Making Tequila

---

[97] October 19, 2004 Office Action.

> Tequila has become synonymous with the culture and heritage of Mexico. Much like Champagne and Cognac are indigenous to France, tequila is identified by the geographic region from which it originates.[98]

Opposer argues that the lower case treatment shows that American consumers perceive the word Tequila to be a common noun, rather than a geographic indicator.[99] In a previous case, the Board explained the probative value of such usage by writers and editors as set forth below:

> While one should not place determinative weight upon whether or not the journalists and editors involved in these randomly-selected newspaper articles use an upper-case or lower-case letter "R," we find it instructive that in a majority of these instances, the word "Realtor" is capitalized and used in a manner consistent with respondent's position that this term functions as an identifier for its members — not as a generic designation for all real estate agents. Respondent also points to many instances in the record where newspapers and magazines clearly use the term "Realtor" in a manner consistent with the proprietary nature of the term.

*Zimmerman v. Nat'l Ass'n of Realtors,* 70 USPQ2d 1425, 1434 (TTAB 2004). *Compare In re Noon Hour Food Prods., Inc.,* 88 USPQ2d 1172, 1179 (TTAB 2008) ("where writers use the term 'bondost' as a single word in all lower-case letters, the presumption to be drawn from such references is that it is perceived, at least by the author, as a generic type of cheese."); and *In re Cooperativa Produttori Latte E Fontina Valle D'Acosta,* 230 USPQ at 134 ("the lower-case treatment of this word by the references to name a kind of cheese with certain hardness, texture and flavor

---

[98] June 9, 2005 Office Action.

[99] Opposer's Brief, p. 28 (167 TTABVUE 29).

characteristics, and the fact that the record reveals that there is a *domestic* fontina cheese demonstrates to us that, to the American purchaser, 'fontina' primarily signifies a type of cheese . . . regardless of regional origin.").

However, we have a mixed record where Tequila is used both as a noun and as a geographic place name. In fact, in some instances lower case uses of the term Tequila are in articles discussing the unique geographic origin of Tequila so we cannot necessarily assume that the use of the lower case "t" indicates no knowledge of geographic origin. *See e.g.,*

> IPGuardians.org – "In fact, tequila named after its place of origin, the Tequila region of the state of Jalisco, is a symbol of Mexico's national identity."[100]
>
> LasMagaritas.com – "tequila is made out of a variety of magueys . . . but the truest definition of the product restricts it – in the same say the French define a bottle of Champagne as the product of the Champagne region of France – to the Jalisco region and to the agave plant."[101]
>
> CocktailTimes.com – "tequila is identified by the geographic region from which it originates."[102]
>
> The Monitor (McAllen, Texas) (May 5, 2004) – "Tamaulipas, a largely agricultural state . . . is one of five Mexican states certified to grow blue agave and produce tequila."[103]

As we noted in footnote 30, *supra,* in many instances the product is called by the name of the certification mark (*e.g.*, Scotch, Cognac, *etc.*).

---

[100] October 19, 2004 Office Action.

[101] October 19, 2004 Office Action.

[102] June 9, 2005 Office Action.

[103] June 9, 2005 Office Action.

### 6. Use of Tequila on signs in retail stores.

Opposer, through Daniel Streepy, Opposer's Executive Vice President of Sales, introduced photographs of liquor stores "depicting how tequila and tequila-based products are merchandised,"[104] purportedly showing retailers using Tequila as a category of spirits. To that end, Opposer introduced 17 photographs of liquor store interiors; but not the entire interior of the stores. Thus, we do not see how the retailers display all the varieties of spirits, wines and other beverages. In that regard, the photographs comprising Streepy Exhibit No. 1 show a liquor store display of "Tequila" next to a display of "Rum," and in the background there is a similar display for "Scotch."[105] Scotch whisky "is a distinctive product of Scotland, manufactured in compliance with the laws of the United Kingdom regulating the manufacture of Scotch whisky."[106] That retailer treats Tequila and Scotch the same as rum. *See also* Streepy Exhibit No. 2 displaying "Cognac/Brandy" and "Tequila;"[107] Streepy Exhibit No. 7 displaying "Tequila," "Gin," "Vodka," "Canadian Whiskey," and "American Whiskey Bourbon;"[108] Streepy Exhibit No. 8 displaying "Tequila," "Vodka," and

---

[104] Streepy Dep., p. 12 (148 TTABVUE 13).

[105] 148 TTABVUE 65-66.

[106] 27 C.F.R. § 5.22(b)(7).

[107] 148 TTABVUE 67. Cognac "is a grape brandy distilled in the Cognac region of France, which is entitled to be so designated by the laws and regulations of the French government." 27 C.F.R. § 5.22(d)(2).

[108] 148 TTABVUE 72. Canadian whisky "is a distinctive product of Canada, manufactured in Canada in compliance with the laws of Canada regulating the production of Canadian whisky." 27 C.F.R. § 5.22(b)(9).

"Canadian Whiskey";[109] Streepy Exhibit No. 15 displaying "Tequila," "Bourbon," "Rum," and "American Whiskey."[110] Because not all of the Streepy exhibits show how other spirits are used on signs in retail stores, and because some of the Streepy exhibits show that retailers use the term Tequila in the same manner as they use other indications of geographic origin, the Streepy exhibits do not persuade us that spirits retailers perceive Tequila as a generic term.

Opposer, on the other hand, argues that because these same spirit retailers organize wine and craft beer by country, and do not organize Tequila and Tequila-based distilled spirit specialty products by country of origin, "at retail . . . the term tequila is offered as nothing more than a placeholder for a type or category of alcohol and not a geographic source indicator."[111] The problem with Opposer's argument is that wine and craft beer originate from many countries and there is no evidence that authentic Tequila originates anywhere but Mexico, so there is no reason for retailers to designate the country of origin. Also, there is no evidence whether the retailers organized spirits such as rum, vodka, and gin in the same manner as wine and beer by country of origin.

### 7. Consumer surveys.

Both parties submitted surveys in support of their respective positions.

#### a. Opposer's survey.

---

[109] 148 TTABVUE 73. "'Whisky distilled from bourbon . . . mash' is whisky produced in the United States." 27 C.F.R. § 5.22(b)(2)

[110] 149 TTABVUE 2.

[111] Opposer's Brief, p. 34 (167 TTABVUE 35) (citing Streepy Dep, pp. 25-26 (148 TTABVUE 26-27)).

Opposer submitted a survey "to determine what the meaning of the term TEQUILA is to the relevant public in the United States, that is, consumers of hard liquor."[112] The results of Opposer's survey are not meaningful because of defects with respect to the universe of respondents.

Opposer selected purchasers of hard liquor rather than purchasers of Tequila (*i.e.,* "spirits distilled from the blue tequilana weber variety of agave plant") for its universe of respondents.[113] According to Philip Johnson, Opposer's consumer survey expert, he chose consumers of hard liquor as the universe because there is a substantial overlap between purchasers of hard liquor and Tequila although he was unable to quantify the extent of that overlap.[114] According to Dr. Johnson, Tequila is part of the "competitive set" of hard liquor (*i.e.,* Tequila is one of the choices consumers make when purchasing hard liquor).[115] However, Dr. Johnson did not know what percentage of hard liquor purchasers purchase Tequila or whether the majority of the respondents in his survey had purchased Tequila in the thirty days prior to the survey or intended to purchase Tequila within the next thirty days.[116] It

---

[112] Johnson Dep., Exhibit 1 (126 TTABVUE 89 at 92).

[113] Johnson Dep., Exhibit 1 (126 TTABVUE 89 at 92 and 95).

[114] Johnson Dep., Exhibit A (Johnson Discovery Dep., pp. 27-28 (126 TTABVUE 446-447)).

[115] Johnson Dep., p. 27-28 (126 TTABVUE 28-29).

[116] Johnson Dep., p. 68 (126 TTABVUE 69) and Johnson Dep. Exhibit A (Johnson Discovery Dep., pp. 30-31 (126 TTABVUE 449-450). The 30 days before and after the interview was part of the survey protocol for screening respondents. Johnson Dep., Exhibit 1 (126 TTABVUE 89 at 95-96 and 120).

is possible, though unlikely, that none of Johnson's respondents ever considered purchasing Tequila.[117]

Alexander Simonson, Ph.D., Applicant's consumer survey expert, provided the following analysis regarding Opposer's universe of respondents:

> 14. Those consumers who are not actual or potential purchasers would be less knowledgeable and thus their perceptions as measured in a survey would likely vary from those who purchase the relevant product.
>
> 15. Merely purchasing hard liquor or intending to do so does not qualify someone as an actual or potential purchaser of this kind of product unless one would assume that anyone purchasing products with a certain percentage of alcohol would be likely to purchase any such products no matter the type.
>
> 16. Not one of the consumers qualified in the Johnson Survey may have purchased or intended to purchase the kind of product at issue (a particular kind of Agave distillate for which the term TEQUILA would be present). The scotch purchaser, the vodka purchaser, the gin purchaser, would all be irrelevant if they also did not happen to be Agave distillate purchasers (but Mr. Johnson interviewed anyone who, in a time frame, had purchased hard liquor or intended to do so). Therefore, this criterion for the relevant consumer as "anyone purchasing or likely to purchase hard liquor" is overbroad and improper.[118]

Applicant, in its survey, asked whether potential respondents were purchasers of hard liquor, as well as purchasers of Tequila, to determine the ratio of hard liquor purchasers to Tequila purchasers.[119]

> Of those screened, 69.0% were purchasers of hard liquor. In contrast, only 21.9% were purchasers of Tequila. This

---

[117] Johnson Dep., pp. 68-69 (126 TTABVUE 69-70).

[118] Expert Declaration of Alexander Simonson, pp. 9-11 (100 TTABVUE 15-17).

[119] Simonson Dep., Exhibit 3 (100 TTABVUE 359 and 389-391).

indicates a sharp divergence between the two universes. The universe of hard liquor purchasers is significantly overbroad with respect to Tequila and the relevant universe for such product.[120]

The Federal Judicial Center's 2011 Reference Manual on Scientific Evidence emphasizes that:

> A survey that provides information about a wholly irrelevant population is itself irrelevant. Courts are likely to exclude the survey or accord it little weight . . . Coverage error is the term used to describe inconsistencies between a sampling frame and a target population.[121]

By selecting an overly broad universe that included respondents without any knowledge of Tequila, Opposer skewed the results of the survey in its favor. As indicated above, we find that the relevant public is purchasers of Tequila (*i.e.,* spirits distilled from the blue tequilana weber variety of agave plant). Purchasers of hard liquor is too broad a universe because there are purchasers of hard liquor who may not purchase Tequila, may not know anything about Tequila, or may not care at all about Tequila.

b. Applicant's survey.

Applicant authorized a consumer survey "to determine whether and to what extent the term TEQUILA on alcoholic beverages indicates to relevant consumers that the product is made in Mexico."[122] It was a mall intercept survey incorporating

---

[120] Simonson Dep., Exhibit 3 (100 TTABVUE 364).

[121] Reference Manual on Scientific Evidence, 377–378 (Federal Judicial Center 3rd ed. 2011).

[122] Simonson Dep., Exhibit 3 (100 TTABVUE 354 at 356). Opposer argues that the Simonson survey failed to ask any questions relating to the primary significance of the term Tequila and, therefore, failed to measure the primary significance of that term. Johnson's Review and Critique of the Simonson Survey (151 TTABVUE 6 at 12). However, Applicant's survey did not attempt to measure the primary significance of Tequila; it sought to measure whether it

facilities in many of the same cities selected by Opposer.[123] Applicant's survey encompassed 502 valid survey responses.[124]

> The relevant universe for this study was defined as males and females 21 years of age or older who either (a) within the past month had purchased Tequila or (b) within the coming month was [sic] planning to purchase Tequila.[125]

In addition to screening potential respondents about Tequila, the screening questionnaire included questions about whisky, gin, and vodka. Purchasers and potential purchasers of those products would be asked questions about their perceptions of those terms.[126] As indicated above, 502 respondents were qualified to answer questions about Tequila. Of those 502 respondents, 206 respondents were qualified to answer questions about whiskey, 173 respondents were qualified to answer questions about gin, and 398 respondents were qualified to answer questions about vodka.[127]

---

indicates that the product is made in Mexico. As noted above, "[a] certification mark used to certify regional origin as well as qualities and characteristics associated with the origin will not be deemed to have become a generic term as applied to particular goods unless it has lost its significance as an indication of regional origin for those goods." *Tea Board of India v. Republic of Tea Inc.,* 80 USPQ2d at 1887. Thus, so long as Tequila is perceived as an indication of regional origin for the goods, it will not be considered to be generic.

[123] Simonson Dep., Exhibit 3 (100 TTABVUE 358 and 360); Johnson Dep., Exhibit 1 (126 TTABVUE 93).

[124] Simonson Dep., Exhibit 3 (100 TTABVUE 364).

[125] Simonson Dep., Exhibit 3 (100 TTABVUE 358). This was the same time frame utilized in Opposer's survey. Johnson Dep., Exhibit 1 (126 TTABVUE 95).

Opposer's consumer survey expert argues that Applicant's universe is too narrow. Johnson's Review and Critique of the Simonson Survey (151 TTABVUE 6 at 12). As previously discussed, we find that Applicant selected the proper universe and that the universe utilized by Opposer in its survey was too broad.

[126] Simonson Dep., Exhibit 3 (100 TTABVUE 359 and 361).

[127] Simonson Dep., Exhibit 3 (100 TTABVUE 365).

Respondents were instructed to inform the questioner, with respect to any question, if they had not formed an opinion.[128] For each beverage term for which the respondent was qualified, the interviewer asked the respondent the following question:

> When an alcoholic beverage is identified as _____, does or doesn't the fact that it's identified as _____ communicate or indicate to you the country in which it is made?[129]

If the respondent says yes, the following questions are asked:

> What country?
>
> What makes you say that?[130]

The results of the survey are set forth below:

---

[128] Simonson Dep., Exhibit 3 (100 TTABVUE 363 ("If there's any reason that you cannot answer because you haven't formed an opinion one way or another, please just tell me so.")).

[129] Opposer argues that this question is leading and suggestive because it "forcibly limits respondents to identify just one country . . . in response to the term they were asked about rather than allowing respondents to identify more than one country. This form of questioning prevents respondents from verbalizing their belief as to the country or countries in which it is made, and fails to determine their belief as to whether each product is or is not exclusively made in a single country." Johnson's Review and Critique of the Simonson Survey (151 TTABVUE 6 at 13-14). Dr. Simonson argues that using "countries" instead of "country" would take away from determining whether respondents believe Tequila is associated with a particular country. Simonson Dep., p. 157 (177 TTABVUE 160). He explained that he asked the question using "country" so respondents would "indicat[e] that they believe it comes from that country and not other countries." Simonson Dep., p. 92 (100 TTABVUE 255) and 151 (177 TTABVUE 154) ("They were asked whether they believed it came from one particular country."). As noted below, while 16 respondents associated Tequila with Mexico, they did not associate it exclusively with Mexico, thus indicating that at least some respondents were able to convey their understanding that Tequila originates from more than one country. While Applicant could have phrased the question as whether the term communicates the country or countries in which it is made, we find that Applicant's results remain probative.

[130] Simonson Dep., Exhibit 3 (100 TTABVUE 362).

Question 1: When an alcoholic beverage is identified as _____, does or doesn't the fact that it's identified as _____ communicate or indicate to you the country in which it is made?[131]

| Beverage | Total Respondents | Yes | No | Don't know/not sure |
|---|---|---|---|---|
| | | | | |
| Tequila | 502 | 316 respondents 62.9% | 163 respondents 32.5% | 23 respondents 4.6% |
| | | | | |
| Whiskey | 206 of the 502 total respondents qualified to answer questions about whiskey | 71 respondents or 14.1% of the 502 respondents or 34% of the qualified whiskey respondents | 117 respondents or 23.3% of the 502 respondents or 57% of the qualified whiskey respondents | 18 respondents or 3.6% of the 502 respondents or 9% of the qualified whiskey respondents |
| | | | | |
| Gin | 173 of the 502 total respondents qualified to answer questions about gin | 27 respondents or 5.45% of the 502 respondents or 16% of the qualified gin respondents | 124 respondents or 24.7% of the 502 respondents or 72% of the qualified gin respondents | 22 respondents or 4.4% of the 502 respondents or 13% of the qualified gin respondents |
| | | | | |
| Vodka | 398 of the 502 total respondents qualified to answer questions about vodka | 142 respondents or 28.3% of the 502 respondents or 36% of the qualified vodka respondents | 224 respondents or 44.6% of the 502 respondents or 56% of the qualified vodka respondents | 32 respondents or 6.4% of the 502 respondents or 8% of the qualified vodka respondents |

---

[131] Simonson Dep., Exhibit 3 (100 TTABVUE 365).

Of the 316 respondents who said that Tequila indicates the country in which it is made, 294 respondents (58.6% of the total sample) said that Tequila indicates being from Mexico.[132] However, while 16 of those respondents associate Tequila with Mexico, they did not associate it exclusively with Mexico. Thus, a total of 278 of the 502 respondents (55.4%) believe that Tequila indicates that the product is made in Mexico.[133]

> No respondents mentioned Mexico for any other terms, Whiskey, Gin or Vodka, indicating that the choice of Mexico was not caused by a proclivity to guess Mexico.[134]

E. Analysis

As noted above, Opposer must prove that Applicant's mark is generic by a preponderance of the evidence. *Princeton Vanguard, LLC*, 114 USPQ2d at 1830 n.2; *Magic Wand Inc.*, 19 USPQ2d at 1554; *Tea Bd. of India,* 80 USPQ2d at 1887.

---

[132] Simonson Dep., Exhibit 3 (100 TTABVUE 366).

[133] Simonson Dep., Exhibit 3 (100 TTABVUE 376).

[134] Simonson Dep., Exhibit 3 (100 TTABVUE 366). According to Dr. Simonson, to the extent that respondents are guessing Mexico when they hear tequila, "we can measure that by looking at to what extent they're guessing Mexico to other spirits." Simonson Dep., pp. 119-120 (100 TTABVUE 282-283). On the other hand, Opposer argues that Applicant does not properly use its controls (i.e., whiskey, vodka, and gin) to adjust for the high rate of errors in survey results (*i.e.*, 36% of the vodka respondents, 34% of the whiskey respondents, and 16% of the gin respondents erroneously stated that the respective spirits identify their country of origin). Johnson's Review and Critique of the Simonson Survey (151 TTABVUE 6 at 14-15). We disagree with the premise that respondents who were wrong about the origin of whiskey, vodka, and/or gin are somehow wrong about their perception of the origin of Tequila. There may be other factors causing those erroneous answers. The purpose of the control is to test whether respondents are guessing Mexico. "It doesn't suggest that the people who believe that Tequila is from Mexico are wrong because there are people who believe that vodka is from Russia. What would suggest that there is a problem is if people with other spirits are believing that they're from Mexico, because that would suggest . . . maybe they're guessing Mexico" Simonson Dep., pp. 126-127 (100 TTABVUE 289-290). In other words, that somebody believes that vodka is from Russia is irrelevant to whether someone believes that Tequila comes from Mexico. *Id.* at 294.

Moreover, so long as a certification mark used to certify regional origin as well as qualities and characteristics associated with the origin has not lost its significance as an indication of regional origin for those goods, it will not be deemed to have become a generic term as applied to those goods. *See Tea Bd. of India,* 80 USPQ2d at 1887 (citing *Institut National Des Appellations d'Origine v. Brown-Forman Corp.,* 47 USPQ2d at 1885). In other words, a term that identifies a category of spirit would not be generic if it also serves to identify geographic origin (*e.g.,* a type of spirit from Mexico).

The evidence recounted above, particularly the information in the standard reference works, advertising and brand names engendering an association with Mexico, labels on every bottle sold that include the statement "Product of Mexico" or "Hecho en Mexico," and Applicant's survey finding that 55.4% of the respondents believe that Tequila indicates that the product is made in Mexico, counters Opposer's assertion that Tequila is a generic term. Rather, the evidence tends to show that Tequila has significance as a designation of geographic origin. At best, the record in this case is mixed. Because Opposer failed to sustain its burden of showing that Tequila is a generic term by a preponderance of the evidence, we dismiss Count I of the opposition on the ground that Tequila is generic.

## VII. Whether Applicant exercises legitimate control over the use of the term "Tequila" as a certification mark for distilled spirits originating in Mexico and made in accordance with the laws of Mexico?

Opposer alleges that Applicant "has not and is not controlling the use of the term tequila in the United States, and further cannot exercise legitimate control over use

of the term tequila in the United States as required by 15 U.S.C. §§ 1063-1064."[135]

According to Opposer, within the United States, the TTB, in the U.S. Department of Treasury, "has authority over the use of tequila."[136]

To conduct business as a distillery, brewery or a winery or other activities involving alcoholic beverages, a company must be approved by and obtain a registration under the Internal Revenue Code and Federal Alcohol Administration Act.[137]

> Q. What about if I wanted to be - - if I wanted to make beverage alcohol in the United States, what would I need to do?
>
> A. You'd have to register under the Internal Revenue Code for a distilled spirits plant, and you would have to obtain an approved federal FAA Act permit as a producer of beverage alcohol.[138]

The Federal Alcohol Administration Act regulates distilled spirits in the United States and it provides the Department of Treasury with the authority to promulgate regulations to control alcoholic beverages.[139]

> The general parameters of the FAA provides who is authorized to conduct business in the alcohol industry and to provide prevention of any fraud in the alcohol industry as far as informing the public of what they can have - - what the alcoholic beverages are.[140]

---

[135] Amended Notice of Opposition ¶42 (59 TTABVUE 10).

[136] Opposer's Brief, p. 45 (167 TTABVUE 46).

[137] McMonagle Dep., pp. 13 (128 TTABVUE 14).

[138] McMonagle Dep., pp. 13-14 (128 TTABVUE 14-15).

[139] McMonagle Dep., p. 24 (128 TTABVUE 25).

[140] McMonagle Dep., p. 25 (128 TTABVUE 26).

"The TTB is the sole agency with authority to enforce any of the regulations pertaining to importation, storage, bottling, advertising, labelling of distilled spirits products, including tequila, in the United States."[141] With respect to businesses that import, bottle and distribute Tequila, the TTB "ensures that bottling of, and bulk storage operations for, tequila is prohibited in the United States unless conducted by a distiller, warehouseman, or processor as those terms are defined in the United States code"[142] and "[t]hat no label for products that claim to be tequila or claim to contain tequila contains any brand name which, standing alone, or in association with other printed material would not be in compliance."[143]

> That the sole agency with the authority to enforce the regulations pertaining to importation, storage, bottling, advertising and labelling of distilled spirits, and distilled spirits products, including tequila, in the United States, rests with the Alcohol and Tobacco Tax and Trade Bureau.[144]

To the extent that Opposer is arguing that the application of Title 27 of the Code of Federal Regulations by the TTB exceeds or negates Applicant's certification mark rights under common law or as may be acknowledged by the USPTO under the Trademark Act, Opposer is not correct. The TTB has no authority to make determinations as to trademark registrability under the Trademark Act.[145]

---

[141] McMonagle Dep., p. 32 (128 TTABVUE 33). *See also* McMonagle Dep., p. 34 (128 TTABVUE 35).

[142] McMonagle Dep., p. 34 (128 TTABVUE 35).

[143] McMonagle Dep., p. 36 (128 TTABVUE 36).

[144] McMonagle Dep., p. 37 (128 TTABVUE 38).

[145] It should be noted that Trademark Rule 2.69, 37 C.F.R. § 2.69 provides that:

While determinations by other agencies of the government may, at times, have a bearing on the question of a party's right of registration of a mark, the Trademark Act of 1946 specifically vests jurisdiction in respect to the right of registration of a trademark solely upon the United States Patent Office.

Furthermore, and in any event, the [TTB] has no authority to concern itself with proprietary rights in brand names, its only concern being the acceptability of brand names from the viewpoint of the label requirements of the Federal Alcohol Administration Act and regulations issued thereunder. Accordingly, the issuance of a certificate of label approval by this bureau merely signifies that such label complies as to form with the requirements of the above-mentioned regulations and the issuance of the certificate does not afford protection under the trademark statute.

*The Scotch Whisky Ass'n v. S. Comfort Corp.,* 176 USPQ 494, 495 (TTAB 1973). *See also Institut National Des Appellations D'Origine v. Vintners Int'l Co.,* 958 F.2d 1574, 22 USPQ2d 1190, 1197 (Fed. Cir. 1992) ("We deal here only with the issue of registrability and what may be registered in the PTO. It is not our concern or that of the PTO what [applicant] must do to comply with the BATF [now TTB] *labelling* requirements."); *In re Quady Winery Inc.,* 221 USPQ 1213, 1214 (TTAB 1984) ("Label approval signifies compliance with BATF [now TTB] requirements, but does not

When the sale or transportation of any product for which registration of a trademark is sought is regulated under an Act of Congress, the Patent and Trademark Office may make appropriate inquiry as to compliance with such Act for the sole purpose of determining lawfulness of the commerce recited in the application.

Section 907 of the ***Trademark Manual of Examining Procedure*** (October 2016) indicates that "the USPTO does not routinely solicit information regarding label approval under the Federal Alcohol Administration Act or similar acts. However, if the record indicates that the mark itself or the goods or services violate federal law, an inquiry or refusal must be made."

afford trademark protection under the trademark statute. The Patent and Trademark Office is the agency with the jurisdiction to determine trademark registrability."). *Cf. The Am. Meat Inst. v. Horace W. Longacre, Inc.,* 211 USPQ 712, 722 (TTAB 1981) ("The question of registrability of a designation involved in a proceeding such as this [an opposition] must necessarily be determined not by the criteria enumerated in regulations governing the label approval functions of the Department of Agriculture, but rather by the specific provisions of the Trademark Act of 1946 governing the registration of trademarks; the interpretation of these provisions by this and other tribunals; and the application of these provisions to the particular fact situation created by the record in the case under determination.").

The facts in *Bureau National Interprofessionnel Du Cognac v. Int'l Better Drinks Corp.,* 6 USPQ2d 1610, 1614 (TTAB 1988) are instructive in this case. The Board found, by virtue of the evidence in the record, the term COGNAC serves as a common law certification mark of regional origin as well as the quality of the brandy entitled to display that designation to consumers of the relevant goods. While the regulations of the U.S. Bureau of Alcohol, Tobacco and Firearms (BATF) [now the TTB] restrict the use of the COGNAC designation in the United States to brandy which is entitled to be so designated by French law, these rules and regulations of the BATF did not create nor prevent Opposer's trademark rights. *See also Institut National Des Appellations d'Origine v. Brown-Forman Corp.,* 47 USPQ2d 1875, 1884-85 (TTAB 1998) (finding that COGNAC is a common law regional certification mark based on evidence of consumer perception, separate and apart from the fact that the BATF

(now TTB) established a standard of identity for Cognac brandy which specifies that the designation COGNAC applies only to grape brandy distilled in the Cognac region of France).

Opposer also argues that Applicant does not control use of the term Tequila in Mexico, and that the Mexican government, not Applicant, is the owner of the term Tequila.

> The Mexican Government is the only legitimate owner of the rights and interests in the term tequila. Applicant concedes that it is the Mexican Government through IMPI, not Applicant, who has the sole and exclusive authority to allow or permit third parties to use the term tequila on alcohol beverages in Mexico. [Applicant's] activities, as an agent of the Mexican Government, are limited to evaluating compliance of alcohol products with Mexican laws, specifically the Official Norm for tequila. Applicant's responsibilities in Mexico do not include any enforcement activities relating to proper use of the term tequila. Those activities are vested in a different branch of the Mexican Government. Applicant's admitted lack of enforcement responsibilities is fatal to its efforts to secure a registration for tequila here. (Internal citations omitted).[146]

In 2012, the Mexican Institute of Industrial Property, the "legitimate and only holder of the Designation of Origin of Tequila," authorized Applicant "to request the registration of the Certification Brand of Tequila in the United States, because

---

[146] Opposer's Brief, pp. 47-48 (167 TTABVUE 48-49). Opposer cited *Syndicat Des Proprietaires Viticulteurs De Chateauneuf-Du-Pape v. Pasquier DesVignes*, 107 USPQ2d 1930, 1935 (TTAB 2013) to support its argument that Applicant's "lack of enforcement responsibilities is fatal to its efforts to secure a registration for tequila" in the U.S. However, in that case, there were multiple parties responsible for defending the geographic designation whereas, as discussed below, in this case, the Mexican government authorized only Applicant to seek registration of Tequila as a certification mark in the United States because Applicant verifies compliance with the Official Mexican Standard for Tequila and, thus according to the Mexican government, has the ability to protect the mark.

[Applicant] has the structure to organize and manage the registration, contributing to the protection of the First Designation of Origin of Mexico."[147]

The question we must answer is whether Applicant is the proper applicant. TMEP § 1306.05(b)(ii) provides the following insight (emphasis added):

> [W]hen geographic designations are used to certify regional origin, a governmental body or government-authorized entity is usually most able to exert the necessary control to ensure all qualified parties in the region are free to use the designation and to discourage improper or otherwise detrimental uses of the certification mark.
>
> … The government of a region would be the logical authority to control the use of the name of the region. ***The government, either directly or through a body to which it has given authority, would have power to preserve the right of all persons entitled to use the mark and to prevent abuse or illegal use of the mark***.
>
> ***The applicant may be*** the government itself (such as the government of the United States, a state, or a city), one of the departments of a government, or ***a body operating with governmental authorization that is not formally a part of the government***. There may be an interrelationship between bodies in more than one of these categories and the decision as to which is the appropriate body to apply depends on which body actually conducts the certification program or is most directly associated with it.
>
> If an applicant's authority to control use of a geographic certification mark featuring a geographic designation is not obvious, or is otherwise unclear, such as when the applicant is not a governmental entity, the examining attorney must request clarification, using a Trademark Rule 2.61(b) requirement for information . . . ***One acceptable response would be an explanation that the relevant governmental body has granted the***

---

[147] Applicant's response to Opposer's request for admission No. 1 and Exhibit A (96 TTABVUE 12 and 18-19). Compare with the "Introduction" to the Official Mexican Standard for Tequila (2012) which identifies "Mexico" as the holder of the "Origin Denomination 'Tequila.'" (102 TTABVUE 148 at 150).

***applicant the authority to implement the certification program***.

As noted above, the Mexican Institute of Industrial Property authorized Applicant to register TEQUILA as a certification mark in the United States because Applicant is the organization that verifies compliance with the Official Mexican Standard for Tequila. Applicant is "accredited and approved" to verify compliance with the standard: that is, Applicant is authorized to evaluate whether the production of Tequila meets the requirements of Mexican Law.[148]

> 4.29 Compliance Assessment Agency
>
> [Applicant] or the accredited and approved corporation, under the terms established by the Law, to prove compliance with this NOM.[149]

Further, "No natural or artificial person [may] produce, bottle or market Tequila that has not been certified by the Assessing Organism."[150] As explained by Mr. Cruz,

> All manufacturers and bottlers that fulfill those requirements that are set on the official norm of tequila, can be certified by [Applicant] because it has been certified and approved to issue those certificates.

---

[148] Official Mexican Standard for Tequila (2006) (102 TTABVUE 113 at 120); Official Mexican Standard for Tequila (2012) (102 TTABVUE 148 at 154). *See also* Cruz Dep., pp. 8, 15-26 and Exhibits 4A, 5A, 6A, 7A, 8A and 9A (170 TTABVUE 10, 17-18, 191, 197, 204, 209, 220, and 236); p. 55 (170 TTABVUE 57)("[Applicant] is accredited and approved according to Mexican laws to carryout activities or evaluation of the conformity.").

[149] Section 4.29 of the Official Mexican Standard for Tequila (2006) (102 TTABVUE 113 at 120); *see also* Section 4.31 of the Official Mexican Standard for Tequila (2012) (102 TTABVUE 148 at 154).

[150] Section 10.1 of the Official Mexican Standard for Tequila (2012) (102 TTABVUE 148 at 162).

> And I repeat, this accreditation and approval is issued by the government of Mexico and based on the Mexican laws.[151]

In order to be certified as an authorized manufacturer of Tequila, a prospective manufacturer of Tequila submits an application to Applicant. Applicant reviews the application and investigates the applicant's ability to produce Tequila in accordance with the Official Mexican Standard for Tequila and issues an opinion letter.[152]

> With this opinion the manufacturer requests from the national directory of norms the authorization to produce tequila. The next step is that the manufacturer of tequila requests from [Applicant] the authorized producer number.[153]

> \*       \*       \*

> Once the following step, the manufacturer has to present before the Mexican institution of industrial property the authorization of use of the denomination of the origin of the tequila.

> These documents are necessary to request from [Applicant], the certificate of fulfillment of the norm. Once the counsel turns in this certificate of fulfillment of the norm, a service contract between the manufacturer and [Applicant].

> Amongst other things, it is established the permanent verification of the processing of the tequila, that is a summary.[154]

---

[151] Cruz Dep. p. 56 (170 TTABVUE 58).

[152] Cruz Dep. pp. 26-28 (170 TTABVUE 28-30). See also Cruz Dep., p. 32 (10 TTABVUE 34) (when a manufacturer meets the NOM for the production of Tequila, Applicant issues a certificate of fulfillment, sometimes referred to as a certificate of conformity).

[153] Cruz Dep., pp. 26-28 (170 TTABVUE 28-30).

[154] Cruz Dep., pp. 29-30 (170 TTABVUE 31-32). In the above-noted service contract, Applicant agrees to execute its verification duties in an impartial and objective manner. Manufacturers agree to comply with the tequila NOM and to open their facilities for inspection. Cruz Dep., pp. 35-36 (170 TTABVUE 37-38).

Only distilled spirits that comply with the Official Mexican Standard for Tequila may use the term Tequila.[155]

Bottlers of Tequila, such as Opposer, have agreed to abide by the Official Mexican Standard for Tequila through co-responsibility agreements with authorized Tequila manufacturers.[156] Co-responsibility agreements are "required when a manufacturer sells tequila in bulk to a bottler,"[157] whether for rebottling[158] or for use as an ingredient.[159] Even though the co-responsibility agreements are the responsibility of the Mexican Institute of Industrial Property,[160] Applicant maintains a record of the co-responsibility agreements.[161] "Without this agreement, the commercialization of tequila is not allowed."[162]

---

[155] Cruz Dep., pp. 104-105 (170 TTABVUE 106-107).

[156] Cruz Dep., p. 31 (170 TTABVUE 33). "The tequila products should have an agreement of co responsibility with the bottlers that don't produce tequila. And they could be located in Mexico or anywhere in the world." *Id.* at 36-37 (170 TTABVUE 38-39).

[157] Cruz Dep., p. 62 (170 TTABVUE 64).

[158] Cruz Dep., pp. 63-64 (170 TTABVUE 65-66) (any Tequila bottled in the United States must be subject to a co-responsibility agreement).

[159] Cruz Dep., p. 66-67 (170 TTABVUE 69-70). Compare with Applicant's response to Opposer's request for admission No. 8 (96 TTABVUE 54) where Applicant denied that "co-responsibility Agreements allow U.S. distributors to mix tequila with other ingredients to make cocktails."

[160] Cruz Dep., p. 57-59 (170 TTABVUE 59-61). *See also* Section 10.7 of the Official Mexican Standard for Tequila (2012) which reads in pertinent part as follows:

> [W]hen the tequila is bottled by another person other than the authorized producer, a Joint Responsibility Agreement about the compliance with this standard and the Industrial Property Act must be filed before the IMPI [Mexican Industrial Property Institute].

102 TTABVUE 164.

[161] Cruz Dep., p. 41 (170 TTABVUE 43).

[162] *Id.*

Q. What must a bottler of tequila do to become an authorized bottler?

A. Fine, he has to sign an agreement of co-responsibility with the manufacturer that is going to provide the tequila. That agreement has to be approved by the Mexican institute of industrial property.

The other requirement is that it has to obtain from the national directory of norms the certificate of approved bottler or CAE. And it promises to present reports every three months about its initial inventory of purchases, sales, also their losses, final inventory, the brands of tequila that have been involved, the quality of bottled tequila in each one of the brands and the numbers of the lots in which its products were bottled. That is all.

Q. Does the bottler in the co responsibility agreement agree to abide by the Mexican NOM for tequila?

\* \* \*

A. [T]hey agree to fulfill the requirements in the [NOM].

The [NOM] of the tequila provides that the bottler can filter and dilute the tequila to a degree of bottling basically.[163]

Tequila may not be exported from Mexico unless Applicant issues a certificate of export.[164]

Applicant is akin to a foreign manufacturer's importer or distribution agent who may register a mark in its own name with the written consent of the owner of the mark.

---

[163] Cruz Dep. pp. 30-31 (170 TTABVUE 32-33). *See also* Cruz Dep., pp. 42-43 (170 TTABVUE 44-45).

[164] Cruz Dep., p. 45 (170 TTABVUE 47).

It is well established that the ownership of a mark in the United States as between the foreign manufacturer of a product and the exclusive distributor thereof in this country is a matter of agreement between them. (Internal citations omitted). The acknowledgement, express or otherwise, by the manufacturer of the goods abroad that the trademark which it affixes to the goods is the property right of the exclusive distributor or an assignment by the manufacturer to the exclusive distributor of all of the former's rights in the trademark in the United States together with the business and goodwill appurtenant thereto, is sufficient to bestow upon the exclusive distributor a right of ownership of the mark in the United States sufficient to qualify him as "owner" of the mark for purposes of registration under the 1946 Act.

*In re Geo. J. Ball, Inc.,* 153 USPQ 426, 427 (TTAB 1967). *See also Uveritech, Inc. v. Amax Lighting, Inc.,* 115 USPQ2d 1242, 1249 (TTAB 2015) (quoting *Lutz Superdyne, Inc. v. Arthur Brown & Bro., Inc.,* 221 USPQ 354, 362 (TTAB 1884)); *Global Maschinen GmbH v. Global Banking Sys, Inc.,* 227 USPQ 862, 866 (TTAB 1985) ("It is settled law that between a foreign manufacturer and its exclusive United States distributor, the foreign manufacturer is presumed to be the owner of the mark unless an agreement between them provides otherwise."); *Compania Insular Tabaclera, S.A. v. Camacho Cigars, Inc.,* 167 USPQ 299, 302 n.1 (TTAB 1970) ("It is well established that the ownership of a mark in the United States between a foreign producer and a domestic representative is a matter of agreement between them.").

Because Applicant is the entity that verifies compliance with the Official Mexican Standard for Tequila and because the Mexican government through the Mexican Institute of Industrial Property authorized Applicant to apply to register the TEQUILA certification mark in the United States, we find that Applicant has the right and authority to control the use of the term Tequila as a certification mark in

Mexico and in the United States, that Applicant is exercising legitimate control over the use of the term Tequila in the United States, and that Applicant is the owner of the TEQUILA certification mark for purposes of registration in the United States. Therefore, we dismiss Count III of the Notice of Opposition ("Lack of legitimate control").

## VIII.   Fraud

Fraud in procuring a trademark registration occurs when an applicant for registration knowingly makes a false, material representation of fact in connection with an application to register with the intent of obtaining a registration to which it is otherwise not entitled. *In re Bose Corp.*, 580 F.3d 1240, 1245, 91 USPQ2d 1938, 1939-40, 1521(Fed. Cir. 2009); *Torres v. Cantine Torresella S.r.l.*, 808 F.2d 46, 1 USPQ2d 1483, 1484 (Fed. Cir. 1986); *Embarcadero Techs., Inc. v. Delphix Corp,* 117 USPQ2d 1518 (TTAB 2016). A party alleging fraud in the procurement of a registration bears the heavy burden of proving fraud with clear and convincing evidence. *Bose*, 91 USPQ2d at 1243 (quoting *Smith Int'l, Inc. v. Olin Corp.*, 209 USPQ 1033, 1044 (TTAB 1981)). For example, the Board will not find fraud if the evidence shows that a false statement was made with a reasonable and honest belief that it was true, rather than an intent to mislead the USPTO into issuing a registration to which the applicant was not otherwise entitled. *See id.*; *see also Woodstock's Enters. Inc. (Cal.) v. Woodstock's Enters. Inc. (Or.)*, 43 USPQ2d 1440, 1443 (TTAB 1997), *aff'd (unpub'd),* Appeal No. 97-1580 (Fed. Cir. Mar. 5, 1998). Intent to deceive is an indispensable element of the analysis in a fraud case. *See In re Bose Corp.*, 91

USPQ2d at 1941. The standard for finding intent to deceive is stricter than the standard for negligence or gross negligence, and evidence of deceptive intent must be clear and convincing. *Id.*

Opposer contends that Applicant's misrepresentations set forth below "could not have been made in good faith following a basic factual inquiry."[165]

A. "Applicant's counsel falsely represented to the Examiner that the United States recognizes tequila as an 'appellation of origin.'"[166]

In its June 9, 2005 response to an Office Action, Applicant argued that the Trademark Examining Attorney "has ignored the U.S. government's recognition of 'tequila' as an appellation of origin" and that "[w]hile the public may not be aware of the governmental recognition of the term as an appellation of origin or the specific certification function of 'tequila,' they do understand that the goods bearing the mark come only from a specific region in Mexico and not to products produced elsewhere."[167] More specifically, Applicant made the arguments set forth below:

> I. U.S. GOVERNMENTAL RECOGNITION OF TEQUILA AS APPELLATION OF ORIGIN BY LAW AND TREATY
>
> The Examiner states that he disagrees with Applicant's statement that tequila can only be produced in Mexico but does not explain how his position is consistent with clear U.S. government regulations and treaties requiring that

---

[165] Opposer's Brief, p. 52 (167 TTABVUE 53).

[166] Opposer's Brief, p. 52 (167 TTABVUE 53) (citing Applicant's June 9, 2005 response to an Office Action).

[167] Pursuant to Trademark Rules 2.122(b)(1), the entire application file is automatically part of the record. Therefore, arguments and submissions made by Applicant or the Trademark Examining Attorney during the prosecution of the application are part of the record without any action by the parties. *See Cold War Museum, Inc. v. Cold War Air Museum, Inc.,* 92 USPQ2d at 1628.

any product bearing this mark <u>must</u> come from Mexico. The U.S. government protects the designation tequila as an appellation of origin in several ways.

A. BUREAU OF ALCOHOL, TOBACCO AND FIREARMS REGULATIONS

[Citing, discussing, and attaching BATF Rule 5.22(g), 27 CFR § 5.22, and Rule 5.52(c)(1), 27 CFR § 5.52(c)(1).]

B. NAFTA

The North American Free Trade Agreement also includes United States recognition of and promise to protect 'tequila' as an appellation of origin. As provided by Annex 31 to the treaty, a copy of which is attached as Exhibit 2):

[T]he United States shall recognize Tequila and Mezcal as distinctive products of Mexico. Accordingly, Canada and the United States shall not permit the sale of any products as Tequila and Mezcal, unless it has been manufactured in Mexico in accordance with the laws and regulations of Mexico governing the manufacture of Tequila and Mezcal.

Opposer argues that Applicant's purportedly false and misleading statement regarding the status of Tequila as an "appellation of origin" was designed to mislead the Trademark Examining Attorney into believing that the word Tequila has a "special status" under U.S. law.[168] While under U.S. alcohol labeling regulations only wines can bear an appellation of origin to indicate the area in which the grapes are used in the wine were grown, *see* 27 C.F.R. § 4.25, it is clear that in the context of Applicant's response Applicant meant a distinctive product of Mexico as defined by the 27 C.F.R. § 5.22(g) and that it was understood as such by the Trademark

---

[168] Opposer's Brief, p. 52 (167 TTABVUE 53).

Examining Attorney. Thus, Applicant did not make a material misrepresentation. Also, because it included the authorities on which it relied to support its argument that Tequila is recognized as a distinctive product of Mexico and thereby entitled to registration as a certification mark, the evidence suggests that Applicant had a reasonable belief in its position rather than an intent to deceive the USPTO.

B. "Applicant averred that 'practically 100% of the tequila products sold in the world comes from a certified producer and certified brand.'"[169]

In its February 1, 2007 response to an Office Action, Applicant argued that the Trademark Examining Attorney's concern that the existence of numerous third-party registrations consisting in part of the word Tequila is evidence that Applicant does not control the use of that term is unfounded. Applicant submitted a list of certified Tequila producers, a list of bottlers authorized to use the term Tequila, and a list of "marks" which were no longer in force to support the argument that Applicant controls the use of the term Tequila.

> In view of the many parties who are now or have in the past been authorized to use the designation tequila, it is not surprising that numerous parties own registrations containing the word "tequila." These registrations are no way indicative of a lack of legitimate control over the mark by Applicant. ***In terms of volume practically 100% of the tequila product sold in the world comes from a certified producer and certified brand.***" (Emphasis added).

Opposer asserts that the falsity of the statement is demonstrated by "evidence showing tequila 'originating in geographic locations other than the place named in

---

[169] Opposer's Brief, p. 52 (167 TTABVUE 53).

the proposed mark, including 'more than 80 marks for brands of tequila not produced in Mexico' and attachments referencing production of 'tequila' in South Africa and Argentina."[170] Opposer is referring to the evidence in the October 19, 2004 Office Action set forth below:

1.  An article posted on July 6, 2003 on the *IPGuardians.com* website

    Tequila

    Regulations Council Takes Shots at "Fake" Tequila

    Mexico exports many products that are named for their geographic origin. Examples include mescal, bacanora, sotol, amber of Chiapas, Ataulfo mangoes, and coffee of Veracruz. However, none of these products is identified with Mexico and aspects of its culture, such as traditional costumes, as much as tequila. In fact, tequila, named after its place of origin, the Tequila region of the state of Jalisco, is a symbol of Mexico's national identity.

    <p style="text-align:center">*    *    *</p>

    Despite the popularity of Mexican tequila, many other countries produce "tequila" that is not protected and produced under appellation of origin regulations. Worldwide there are more than 80 marks for brands of tequila not produced in Mexico. Most such brands are produced in the United States and Canada, which are the two biggest markets for tequila after Mexico itself. In 2002, U.S. consumers bought 18 percent of all tequila sold.

    As a result, [Applicant] is taking action to ensure that every bottle of tequila is [Applicant]-certified so that consumers will enjoy a consistently high-quality product. In the last two years, [Applicant] which has offices in Washington, Chicago, Madrid, and Tokyo, has destroyed more than two million bottles of "fake" tequila in Asia, Latin America, and the United States. [Applicant] is also seeking to eliminate 30 trademarks for non-Mexican

---

[170] Opposer's Brief, p. 52 (167 TTABVUE 53 (citing the October 19, 2004 Office Action).

> tequila in Argentina, Belgium, Canada, Israel and the United States.

2. An article posted on the MSNBC.com website (November 13, 2003) referenced *supra* discussing a South African Tequila-like product.

3. An excerpt from a news report posted October 19, 2004 on the TequilaAficianado.com website regarding a dispute between Applicant and two companies in Argentina producing a Tequila-like product.

There is nothing of record to support Opposer's claim that Applicant's statement was false or made with an intent to deceive the USPTO. Opposer does not offer one iota of evidence that Applicant's statement that "in terms of volume practically 100% of the tequila product sold in the world comes from a certified producer and certified brand" is false. The evidence, such as it is, is hearsay. Moreover, it does not contradict Applicant's statement (*i.e.,* that there is unauthorized Tequila being produced and sold does not mean that nearly all of the Tequila that is sold is not authorized Tequila).

In view of the foregoing, we dismiss Count VI of the Notice of Opposition ("Fraud on the USPTO").

**Decision**: The opposition is dismissed.

<div style="border:1px solid;">
This Opinion is a
Precedent of the TTAB
</div>

Hearing: September 12, 2016                    Mailed: January 23, 2017

UNITED STATES PATENT AND TRADEMARK OFFICE

‒‒‒‒

Trademark Trial and Appeal Board

‒‒‒‒

*Luxco, Inc.*

*v.*

*Consejo Regulador del Tequila, A.C.*

‒‒‒‒

Opposition No. 91190827

‒‒‒‒

APPENDIX

‒‒‒‒

Michael R. Annis of Husch Blackwell LLP,
for Luxco, Inc.

Lawrence E. Abelman and Marie-Anne Mastrovito of Abelman, Frayne & Schwab,
for Consejo Regulador Del Tequila, A.C.

‒‒‒‒

Before Kuhlke, Bergsman and Adlin,
Administrative Trademark Judges.

Opinion by Bergsman, Administrative Trademark Judge:

### *The Record*

The record includes the pleadings and, by operation of Trademark Rule 2.122(b),

37 C.F.R. § 2.122(b), the file of the application of the mark at issue. The parties

introduced the following testimony and evidence:

A. Opposer's testimony and evidence.

1. Opposer's first notice of reliance on copies of Opposer's pleaded registrations for Tequila and other distilled specialty spirits consisting of Tequila printed from the USPTO electronic database showing the current status and ownership of the registrations;[171]

2. Opposer's second notice of reliance on relevant portions of Title 27 of the Code of Federal Regulations and of the Federal Register purporting to show that prior to 1973, the Bureau of Alcohol, Tobacco and Firearms in the U.S. Treasury Department classified Tequila as a generic term, and after 1973, it classified Tequila as a distinctive product of Mexico "manufactured in Mexico in compliance with the laws of Mexico regulating the manufacture of Tequila for consumption in that country.";[172]

3. Opposer's third notice of reliance on recipes using Tequila appearing in publications in general circulation;[173]

4. Opposer's fourth notice of reliance on prosecution history files from third-party trademark applications purportedly showing that the USPTO required that the exclusive right to use the word Tequila be disclaimed on the ground that it is the generic name for the product;[174]

---

[171] 87 TTABVUE.

[172] 88 TTABVUE. The Bureau of Alcohol Tobacco and Firearms is the predecessor to the Alcohol and Tobacco Tax and Trade Bureau ("TTB"). The TTB is responsible for the administration and enforcement of the laws relating to distilled spirits.

[173] 89 TTABVUE.

[174] 91-93 TTABVUE.

5. Opposer's fifth notice of reliance on the following items:

    a. A copy of the Memorandum of Understanding Between the Office of the United States Trade Representative and The Alcohol and Tobacco Tax and Trade Bureau of the United States Department of Treasury With Respect to the Implementation of the Agreement Between the Office of the United States Trade Representative and the Secretaria De Economia of Mexico on Trade in Tequila (December 16, 2005) from the website of the Alcohol and Tobacco Tax and Trade Bureau ("TTB") of the U.S. Department of Treasury;[175]

    b. A copy of the Agreement Between the Office of the United States Trade Representative and the Secretaria De Economia Of The United Mexican States On Trade In Tequila from the public website of the U.S. Trade Representative;[176]

6. Opposer's sixth notice of reliance on Applicant's responses to Opposer's written discovery;[177]

7. Opposer's seventh notice of reliance on copies of articles published in publications in general circulation;[178]

---

[175] 90 TTABVUE 7-12.

[176] 90 TTABVUE 14-26.

[177] 95-96 TTABVUE and 97-99 TTABVUE (Confidential documents regarding unauthorized use of the term Tequila).

[178] 94 TTABVUE.

8.  Testimony deposition of Philip Johnson, Opposer's consumer survey expert, with attached exhibits;[179]

9.  Testimony deposition of James W. McMonagle, a consultant in the alcohol and tobacco industry, with attached exhibits;[180]

10. Testimony deposition of Ronald R. Butters, Ph.D., Opposer's expert in linguistics, with attached exhibits;[181]

11. Testimony deposition of Gary B. Wilcox, Ph.D., Professor of Advertising at the University of Texas, with attached exhibits;[182]

12. Testimony deposition of David S. Bratcher, Opposer's President and Chief Operating Officer, with attached exhibits;[183]

13. Testimony deposition of Daniel W. Streepy, Opposer's Executive Vice President of Sales, with attached exhibits;[184]

14. Opposer's first rebuttal notice of reliance on articles from the *New York Times*;[185]

---

[179] 126-127 TTABVUE.

[180] 128-129 TTABVUE.

[181] 130-142 TTABVUE.

[182] 143-146 TTABVUE.

[183] 147 TTABVUE. Opposer filed the Bratcher deposition a second time at 159 TTABVUE.

[184] 148-149 TTABVUE. Opposer filed the Streepy deposition a second time at 161 TTABVUE.

[185] 121 TTABVUE. These are purported to be copies of the articles in Applicant's eighth and ninth notices of reliance (110 TTABVUE and 111 TTABVUE). We note that Opposer did not introduce full copies of the articles into evidence in its rebuttal notice of reliance. The documents in Opposer's rebuttal notice of reliance consisted of the headline and, in some cases, the first paragraph of an article, as well as an advertisement for *The New York Times* archive. It is the responsibility of the party making submissions to the Board via the electronic database to ensure that the testimony and/or evidence has, in fact, been properly

15. Opposer's second rebuttal notice of reliance on dictionary definitions of the word Tequila";[186]

16. Opposer's third rebuttal notice of reliance on articles appearing in printed publications in general circulation;[187]

---

made of record. *See Weider Publ'ns, LLC v. D&D Beauty Care Co.*, 109 USPQ2d 1347, 1350-51 (TTAB 2014) (it is the duty of the party making submissions to the Board via the Board's electronic filing system to ensure that they were entered into the trial record), *appeal dismissed per stipulation*, No. 2014-1461 (Fed. Cir. Oct. 10, 2014). Accordingly, we use and rely on the copies introduced by Applicant.

Opposer lodged an objection to the articles in Applicant's eighth and ninth notice of reliance on the ground that the articles do not qualify as printed publications in general circulation because they are available only through a subscription to the archives of *The New York Times*. (121 TTABVUE 4). Opposer's objection is overruled. The articles were originally published in a newspaper available to the general public. The Board generally finds that a document identifying its publication date and source, as do Applicant's documents, may be introduced into evidence pursuant to Trademark Rule 2.122(e) if it is in general circulation. *See Safer Inc. v. OMS Invs. Inc.,* 94 USPQ2d 1031, 1037 (TTAB 2010). The copies submitted with the notice of reliance were simply generated from an archive available by subscription. Opposer did not suggest that any of the articles were erroneous. Moreover, their accuracy was verifiable by researching the underlying source material at a public library. In this regard, the Board "routinely accepts printouts of articles obtained from the Lexis/Nexis database [a subscription service], when filed under notice of reliance, so long as the date and source of each article are clear." *See Alcatraz Media Inc. v. Chesapeake Marine Tours Inc.*, 107 USPQ2d at 1759. *See also Weyerhaeuser Co. v. Katz,* 24 USPQ2d 1230 (TTAB 1992); *Int'l Ass'n of Fire Chiefs, Inc. v. H. Marvin Ginn Corp.,* 225 USPQ 940, 942 n.6 (TTAB 1985) (NEXIS printout of excerpted stories published in newspapers, magazines, etc. are admissible because excerpts identify their dates of publication and sources and since complete reports, whether through the same electronic library or at a public library, are available for verification), *rev'd on other grounds,* 782 F.2d 987, 228 USPQ 528 (Fed. Cir. 1986).

Finally, effective January 14, 2017, Trademark Rule 2.122(e), 37 C.F.R. § 2.122(e), is amended to include the holding in *Safer* permitting Internet evidence to be introduce through a notice of reliance.

[186] 122 TTABVUE.

[187] 123 TTABVUE. These are purported to be copies of articles from Applicant's fifth and sixth notices of reliance (107 and 108 TTABVUE). Opposer objected to these articles on the ground that access to these documents "either require a subscription in order to access the subscribed article, or alternatively the website URL submitted by Applicant in its Notice of Reliance is no longer available via the URL identified." 123 TTABVUE 3. We overrule the objection on the ground that access to the articles requires a subscription for the reasons discussed in footnote 15 *supra*. Moreover, the copies of the articles proffered by Opposer

17. Opposer's fourth rebuttal notice of reliance on two articles purporting to quote Applicant's Technical Commissioner for Tequila Regulations Floriberto Miguel Cruz;[188]

18. A copy of an expert report by Philip Johnson entitled "A Review And Critique Of The Simonson Survey";[189]

19. Rebuttal Expert Report of Gary Wilcox, Ph.D.[190] and

20. Rebuttal Testimony Deposition of David Bratcher, Opposer's President and Chief Operating Officer, with attached exhibits.[191]

B. Applicant's testimony and evidence.

1. Testimony deposition of Floriberto Miguel Cruz, Applicant's Technical Commissioner for Tequila Regulations, with attached exhibits;[192]

2. "Expert Declaration of Alexander Simonson, Ph.D.," including Simonson's critique of the Philip Johnson survey;[193]

---

suffer the same defects as the articles from *The New York Times* discussed in footnote 15. Accordingly, we use and rely on the articles introduced by Applicant.

[188] 124 TTABVUE. Mr. Cruz did not recall being interviewed for those articles. Cruz Dep., pp. 77-79 (170 TTABVUE 79-81).

[189] 151 TTABVUE 6-44. The expert report was stipulated into evidence. 151 TTABVUE 204.

[190] 151 TTABVUE 46-59. The expert report was stipulated into evidence. 151 TTABVUE 204.

[191] 165 TTABVUE.

[192] 170 TTABVUE and 169 TTABVUE (Confidential). The transcript originally was filed at 113-115 TTABVUE and improperly submitted as "highly confidential." The transcript, without exhibits was refiled at 164 TTABVUE.

[193] 100 TTABVUE 7-42. The expert report was stipulated into evidence. 100 TTABVUE 5-6.

3. "Report of A Survey to Determine the Extent to Which the Term 'Tequila' on Alcoholic Beverage is Perceived by Relevant Consumers to Indicate that the Product is Made in Mexico," by Alexander Simonson;[194]

4. Discovery deposition of Alexander Simonson, with attached exhibits;[195]

5. Expert report of Bruce Isaacson, Ph.D., President of MMR Strategy Group, a marketing research and consulting firm, evaluating the expert report of Gary Wilcox, Ph.D.;[196]

6. Discovery deposition of Bruce Isaacson with attached exhibits;[197]

7. Applicant's first notice of reliance on the discovery deposition of Donn Sherman Lux, Opposer's Chairman and Chief Operating Officer, with attached exhibits;[198]

8. Applicant's second notice of reliance on the following items:

---

[194] 100 TTABVUE 43-163. The expert report was stipulated into evidence. 100 TTABVUE 5-6.

[195] 100 TTABVUE 164-601 (partial deposition and exhibits), 177 TTABVUE (text of entire deposition). The deposition was introduced through stipulation. 100 TTABVUE 5-6. The deposition resides in two separate prosecution entries because the text of the entire deposition did not appear in the initial filing. After notification from the Board, Applicant filed the complete transcript, without exhibits, at 177 TTABVUE. We remind parties that it is their responsibility to ensure that the testimony and/or evidence has, in fact, been properly made of record. *See Weider Publ'ns, LLC v. D&D Beauty Care Co.*, 109 USPQ2d at 1350-51.

[196] 100 TTABVUE 602-733. The expert report was stipulated into evidence. 100 TTABVUE 5-6.

[197] 100 TTABVUE 734-990. The deposition was stipulated into evidence. 100 TTABVUE 5-6.

[198] 101 TTABVUE.

    a. "Trade in Tequila Agreement" printed from the website of the TTB of the U.S. Department of Treasury;[199]

    b. Industry Circular No. 2006-3 (May 5, 2006) printed from the website of the TTB of the U.S. Department of Treasury providing the "Standard of Identity for Tequila";[200]

    c. "Certificate of Age and Origin Requirements for Imported Alcoholic Beverages" printed from the website of the TTB of the U.S. Department of Treasury;[201]

9. Applicant's third notice of reliance on the following items:

    a. Opposer's responses to Applicant's first set of requests for admission Nos. 1-12;[202]

    b. Opposer's responses to Applicant's interrogatory No. 11;[203]

    c. Opposer's supplemental responses to Applicant's requests for admission Nos. 13 and 18-25;[204] and

    d. Opposer's second supplemental responses to Applicant's interrogatory Nos. 1, 2, 3, 4, 10 and 11;[205]

10. Applicant's fourth notice of reliance on the following items:

---

[199] 103 TTABVUE 6.

[200] 103 TTABVUE 11.

[201] 103 TTABVUE 16.

[202] 104 TTABVUE 6-13.

[203] 104 TTABVUE 15-19.

[204] 104 TTABVUE 21-28.

[205] 104 TTABVUE 30-41.

   a. Opposer's responses to Applicant's second set of requests for admission Nos. 3, 7, 9, 11, 12, 13, 14, 17, 26, 28 and 31;[206] and

   b. Opposer's responses to Applicant's third set of request for admission Nos. 1-18;[207]

11. Applicant's fifth notice of reliance on articles in publications in general circulation;[208]

12. Applicant's sixth notice of reliance on articles in publications in general circulation;[209]

13. Applicant's seventh notice of reliance on dictionary definitions of Tequila, the Wikipedia entry for Tequila, and the entry for Tequila in the *Encyclopedia Britannica*;[210]

14. Applicant's eighth notice of reliance on articles that refer to Tequila from *The New York Times*;[211]

15. Applicant's ninth notice of reliance on the following items;

   a. Excerpts from Applicant's website;[212]

---

[206] 112 TTABVUE 6-67.

[207] 112 TTABVUE 69-76.

[208] 107 TTABVUE.

[209] 108 TTABVUE.

[210] 109 TTABVUE.

[211] 110 TTABVUE. "These documents were all obtained from the on-line archives of *The New York Times*." 110 TTABVUE 2.

[212] 111 TTABVUE 8.

    b. A copy of an article entitled "Tequila: a spirit with Appellation of Origin," posted on the website tequilaspecialist.com;[213]

    c. A document entitled Tequila Regulatory Council and the "Award T" Program posted at aliassmith.com;[214]

    d. An article entitled "Tequila Certification: One of Our Vegas Editors Becomes a Tequila Sommelier," posted at Escapehatchdallas.com;[215]

    e. An article entitled "Around Town: New Canaan's Tequila Mockingbird Honored" posted at Thebeveragejournal.com;[216]

    f. The Tequila entry in the **_Dictionary of Wines and Spirits_**;[217]

    g. A report presented at the Worldwide Symposium on Geographical Indications entitled "Protection of Geographical Indications: Appellation of Origin" posted on the website of the World Intellectual Property Organization;[218]

    h. An article referring Tequila in an issue of *The New York Times*;[219]

    i. Documents printed from Applicant's website identifying certified companies and brands;[220] and

---

[213] 111 TTABVUE 14.

[214] 111 TTABVUE 24.

[215] 111 TTABVUE 27.

[216] 111 TTABVUE 30.

[217] 111 TTABVUE 34.

[218] 111 TTABVUE 38.

[219] 111 TTABVUE 59. This document was "retrieved on July 20, 2015 from *The New York Times* on-line archives." 111 TTABVUE 5.

[220] 111 TTABVUE 62.

> j. Affidavit of Fernando Hernandez Gomez introducing relevant portions of Mexican law.[221]

---

[221] 102 TTABVUE. Applicant proffered the affidavit of Mr. Gomez with copies of the relevant law pursuant to Fed. R. Civ. P. 44.1. That rule provides the following:

> A party who intends to raise an issue about a foreign country's law must give notice by a pleading or other writing. In determining foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence. The court's determination must be treated as a ruling on a question of law.

The Notes of Advisory Committee on Rules – 1966 explain that "the court may consider any relevant material, including testimony, without regard to its admissibility under Rule 43," that the rule "refrains from imposing an obligation on the court to take 'judicial notice' of foreign law," and it "provides flexible procedures for presenting and utilizing materials on issues of foreign law by which a sound result can be achieved with fairness to the parties."

Opposer moved to strike the affidavit of Mr. Gomez and its attached exhibits on the ground that the parties did not stipulate to the introduction of testimony by affidavit and, thus, the declarant cannot authenticate the exhibits. 116 TTABVUE 3. See also 120 TTABVUE (Opposer's reply in support of its motion to strike). Trademark Rule 2.123(b), 37 C.F.R. § 2.123(b), provides, in relevant part, that by agreement of the parties, the testimony of any witness or witnesses of any party may be submitted in the form of an affidavit by such witness or witnesses. It is clear that Opposer did not agree to the introduction of testimony by Mr. Gomez in affidavit form.

Nevertheless, Opposer's motion to strike is denied. The Gomez affidavit is simply the vehicle for introducing the relevant law of Mexico. As explained by the Committee Notes, this rule expedites the introduction of the relevant Mexican law into the record and removes the necessity of our having to take judicial notice. Alternatively, Applicant could have introduced the relevant Mexican law through a notice of reliance. We have not considered the Gomez affidavit for any purpose other than proffering the Mexican law into the record.

In fact, the Official Mexican Standard for Tequila (Gomez Exhibit E) was made of record in Applicant's September 10, 2004 and February 1, 2007 Responses to Office Actions in the application at issue. Pursuant to Trademark Rule 2.122(b), the entire application file is automatically part of the record. Therefore, this document is part of the record. *See Cold War Museum, Inc. v. Cold War Air Museum, Inc.,* 586 F.3d 1352, 92 USPQ2d 1626, 1628 (Fed. Cir. 2009) ("The entire registration file – including any evidence submitted by the applicant during prosecution – is part of the record in a cancellation proceeding 'without any action by the parties.'").

Opposer also moved to strike the documents on the ground that Applicant did not submit "certified translations of the documents" (citing TBMP § 104 (June 2016)). 116 TTABVUE 9.

TBMP § 104 provides, in pertinent part, that if a party intends to rely on any non-English documents it should submit a certified translation of the document. "If a translation is not submitted, the documents may not be considered." While the manual references a "certified" translation, there is no rule or case that requires the translation to be certified; that is simply a suggested better practice. The cases cited in Section 104 do not reference "certified translations," nor does *Blue Man Prods. v. Tarmann,* 75 USPQ2d 1811, 1814 (TTAB 2005), *rev'd on other grounds,* slip. op. 05-2037, (D.D.C. Apr. 3, 2008) cited by Opposer. The rules governing applications based on foreign registrations under Section 44 and assignments only require that the translation be signed by the individual making the translation. Trademark Rules 2.34(a) and 3.26, 37 C.F.R. §§ 2.34(a) and 3.26. *See also* TMEP § 1004.01(b) ("The translator should sign the translation, but does not have to swear to the translation."). The objection is overruled because Applicant submitted English translations of the documents. In any event, the document on which we relied (Gomez Exhibit E) was a certified translation albeit with a Spanish language certification.

Finally, we note that effective January 14, 2017, Trademark Rule 2.123(a)(1) and (2), 37 C.F.R. §§ are amended to permit testimony in the form of an affidavit or declaration subject to the right of cross examination.